**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| RICARDO TRINDADE, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>SUNNOVA ENERGY INTERNATIONAL INC., WILLIAM J. BERGER, and ROBERT L. LANE,<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Case No. 4:24-cv-00569<br><br>CLASS ACTION<br><br>**JURY TRIAL DEMANDED** |

**<u>FIRST AMENDED CLASS ACTION COMPLAINT</u>**

# TABLE OF CONTENTS

**Page**


I. NATURE OF THE ACTION ....................1

II. JURISDICTION AND VENUE ....................13

III. PARTIES ....................13

A. Plaintiffs ....................13

B. Corporate Defendant ....................14

C. Individual Defendants ....................14

IV. FACTUAL ALLEGATIONS ....................15

A. General Background ....................15

B. Sunnova Recklessly Turned a Blind Eye to Improper Business Practices Because Relying on Dealers to Add Customers Was Cheaper in the Short-Run ....................16

C. Predatory Sales Practices, Poor Service, and Widespread Consumer Complaints ....................21

D. While Facing Growing and Widespread Customer Complaints, Defendants Told Investors to Expect Declining Operating Costs and, Thus, Expanding Profitability ....................30

V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ....................34

A. During the Class Period, Sunnova Repeatedly Misled Investors About Its Predatory Sales Practices, Poor Service, Consumer Complaints, Costs, and Its Commitments to Customers and Shareholders ....................34

B. Defendants Stress the Importance of Monitoring Their Dealer Practice and Training Their Dealers While Omitting Material Information ....................36

C. Pressure to Obtain Government Backing for Project Hestia Leads to Further Material Misrepresentations ....................48

VI. THE TRUTH BEGINS TO EMERGE ....................55

A. Post-Class Period Developments ....................64

VII. LOSS CAUSATION ....................65

VIII. ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER ....................67

A. Defendants' Suspiciously Timed Sales Support Scienter ....................67

B. Defendants' Access to Information Supports Scienter ....................69

C. Defendants' Core Operation—Focused on Customer Service—Supports Scienter ....................70

IX. INAPPLICABILITY OF STATUTORY SAFE HARBOR ....................72

X. THE PRESUMPTION OF RELIANCE ....................73

XI. CLASS ACTION ALLEGATIONS ....................74

XII. CLAIMS BROUGHT PURSUANT TO THE EXCHANGE ACT ....................75

COUNT I (VIOLATIONS OF SECTION 10(B) OF THE EXCHANGE ACT AND SEC RULE 10B-5 PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS) ....................75

COUNT II (VIOLATIONS OF SECTION 20(A) OF THE EXCHANGE ACT AGAINST THE INDIVIDUAL DEFENDANTS) ....................78

PRAYER FOR RELIEF ....................80

JURY DEMAND ....................81

Lead Plaintiffs Christopher Scott Berger and Landon Lueshen ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned counsel, bring this action against Defendants pursuant to Section 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder. Plaintiffs bring these claims on behalf of themselves and all other persons and entities who purchased or otherwise acquired the securities of Sunnova Energy International Inc. ("Sunnova" or the "Company") during the period from July 25, 2019 to May 1, 2024, inclusive (the "Class Period"), and were damaged thereby (the "Class"). The claims asserted herein are alleged against Sunnova and the Company's senior executives during the Class Period: Chief Executive Officer ("CEO") William J. Berger ("Berger") and Chief Financial Officer ("CFO") Robert L. Lane ("Lane").

Plaintiffs allege the following based upon their own personal knowledge and upon information and belief of others. Plaintiffs' information and belief is based, in part, on the ongoing independent investigation of their undersigned counsel, including from the following sources: a review of Defendants' public documents, conference calls, and announcements made by Defendants, SEC filings, wire and press releases published by and regarding Sunnova, accounts from former Sunnova employees, analysts' reports and advisories about the Company, and news and media reports concerning the Company. Plaintiffs also believe in good faith that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Sunnova securities during the Class Period, seeking to recover damages caused by Defendants' violations of the federal

securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2. Sunnova provides energy as a service in the United States. The Company offers electricity, as well as operations and maintenance, monitoring, repairs and replacements, equipment upgrades, on-site power optimization, and diagnostic services. As of October 2023, the Company operated a fleet of residential solar energy systems purportedly serving over 386,000 customers.

3. For years, Sunnova touted its exceptional growth in acquiring new solar customers and made no secret that it did so in part by utilizing a large dealer network. That dealer network grew at an exponential rate for many years. Sunnova repeatedly stated that this dealer network is a unique and material aspect of its business model and separates it from other companies that use in-house sales teams. Sunnova assured stakeholders that it trains, oversees, and reviews its dealers' performance and compliance with the Company's standards. But Sunnova and CEO Berger also pushed "astronomical" sales targets for the Company, including by rushing dealers through the approval process and incentivizing them to engage in sales at all costs. As one former employee explained, this sales tactic led to situations where network dealers installed a solar system that did not meet Sunnova's engineering requirements, but Sunnova's sales leadership approved the system anyway.

4. Particularly relevant to this case, Sunnova's conduct has also led—from before the Class Period and all the way through the Class Period—to rampant predatory sales practices and poor services provided to Sunnova customers. The Puerto Rico Energy Bureau ("PREB"), an oversight body for Puerto Rico, issued a report regarding Sunnova that identified 436 complaints against the Company about misleading and predatory sales practices. The report concluded that

"Sunnova's practices during the contracting process are not consistent with the obligations that power company have" under Puerto Rican law. And Puerto Rico is only the tip of the iceberg: there have been hundreds of complaints about Sunnova and its dealers' predatory sales practices and poor service during the Class Period, and since. For example, between January 31, 2020, and September 2023, there were more than 90 complaints submitted to the Texas Attorney General's Office by consumers about predatory sales practices and poor service by Sunnova. According to a summary spreadsheet obtained by a public records act request by Plaintiffs' counsel from the Texas AG, these complaints were submitted by consumers in multiple states, including New Jersey, New York, California, Florida, Nevada, and Texas. Sunnova was the named Respondent on these complaints. These deceptive practices include targeting the elderly and scamming dementia patients on their deathbeds into signing five-figure, multi-decade solar panel leases. Sunnova knew about and responded to these complaints throughout the Class Period. Similarly, Defendants knew about and responded to the Company's loss of accreditation from the Better Business Bureau ("BBB"), with the Houston and South Texas BBB summarizing the over one thousand complaints it had received in 2022, 2023, and 2024 as follows: "Customer[] complaints and customer reviews alleged deceptive sales practices, poor customer service and they further report installation and repair technicians do not arrive as scheduled." The BBB currently states on its website that "Sunnova Energy Corporation has stated in media, 'We are working closely with the BBB to have our accreditation reinstated.' However, the BBB is not able to work with Sunnova Energy Corporation at this time to have accreditation reinstated as the business currently does not meet the BBB's Standards for Accreditation." The BBB also stated that beginning in 2022, Sunnova received numerous complaints.

5. CEO Berger knew about these rampant problems with predatory sales practices and poor service. Indeed, another former employee stated that in the beginning of 2023, CEO Berger introduced Paul Mathews ("Mathews") at a Company townhall-style meeting as Executive Vice President–Service and Supply Chain for Sunnova, and he said that Mathews would be attempting to tackle the Company's service problems and beefing up the Company's service teams. Mathews faced an uphill battle, as Sunnova's business model incentivized poor customer service. Sunnova makes its money from financing the installation of solar panel systems installed by its dealers. But it does not earn money from servicing those systems installed by its dealers, though it takes on the responsibility for doing so.

6. Despite Defendants' knowledge of these rampant problems with predatory sales practices and poor service, and the complaints about the same, throughout the Class Period, Defendants referred to complaints as "inevitable" and made by "some" customers, while touting the Company's commitment to ethically sound practices and service. For example, in Sunnova's July 2020 Prospectus, after identifying a pre-Class Period investigation by the PREB, Defendants stated that "given the sheer number of interactions our personnel or dealers operating on our behalf have with customers and potential customers," it is "***inevitable*** that some customers' and potential customers' interactions with our company or dealers operating on our behalf will be perceived as less than satisfactory."[1] These statements were repeated in Sunnova's Form 10-Ks filed with the SEC for the years 2019, 2020, 2021, 2022, and 2023. When speaking about the purported "inevitability" of these perception issues—given the sheer volume of interactions with its employees and dealers—the Company did not say anything about the continued widespread nature of the complaints or the internally acknowledged problems with Sunnova employees and its

[1] Emphases added throughout unless otherwise indicated.

dealers who were pushing predatory sales practices and providing inadequate service under pressure from "astronomical" sales targets.

7. During the Class Period, Defendants also continuously made misleading laudatory statements about the Company's dealer model without disclosing the pervasive problems and complaints about predatory sales practices and service problems that stemmed from its dealer-based business model. For example, in an earnings call on May 15, 2020, CEO Berger repeatedly attributed the Company's growth to its growing dealer network. At the same time, the Company claimed that this was possible even though, "We have a very stringent process of bringing dealers on board." In another investor call, when asked about the dealer network and discussing customer growth, CEO Berger stated, "[W]e've got pretty strict protocols. It's hard to become a dealer at Sunnova, but I think that's necessary and certainly gives all of our stakeholders, especially our customers, a lot of comfort." These statements were false and materially misleading, as Sunnova was rushing to add dealers with minimal vetting, leading to predatory sales and service problems and customer complaints that put the Company at risk. And if those statements gave stakeholders, including investors, "comfort," then it was a false sense of comfort given the facts known to the Company and its executives. Nowhere in these statements and the CEO's responses do they mention the pervasive complaints about the predatory sales practices and poor service by Sunnova and its dealers.

8. The pervasive customer complaints created a swelling backlog of costs that Defendants needed to confront. This growing cost backlog was, in essence, a material undisclosed liability because these customers that Sunnova and its dealers ignored needed to be serviced, and that service would cost Sunnova money. So, to remedy the backlog of complaints, Defendants began hiring employees focused on customer service. As of the spring of 2021, a senior Sunnova

former employee (FE 5) reported that there were just a few Sunnova employees in Sunnova's customer service department. By comparison, on the first day of 2022, Sunnova reported that it had 814 employees. Throughout 2022, Sunnova increased hiring, including, among many others, Lisa Diamantis, who joined Sunnova in May 2022 to help vet dealers. By the end of 2022, Sunnova reported to have 1,116 full-time employees. And, according to FE 5, between spring 2021 and spring 2024, Sunnova's customer service department expanded from just a few people to approximately 500.

9. Still, notwithstanding this growing backlog of customer complaints, and the increased hiring expenses required to address them, during an analyst day on November 17, 2022, Defendant Berger said "we do well" with respect to customer service, and Defendant Lane stated that Sunnova's "cost per customer is declining." Defendant Lane also stated that Sunnova's balance sheet was "strong" and Sunnova's liquidity was "very strong," which was misleading in light of the growing backlog of customer complaints, which acted like a liability that did not clearly and properly appear on Sunnova's balance sheet.

10. Sunnova also repeatedly stated, including in its Environmental, Social, and Governance ("ESG") Reports, that it was "committed to leading with integrity, fostering a culture of honesty, maximizing performance, and embracing ethical business practices," and that "[b]ecause ESG is a top priority, we formalized its oversight at the Board level through our Nominating and Governance Committee in October 2020." These claims were repeated over-and-over by Defendants, but they were belied by the facts on the ground. If anything, the material misstatements accelerated: in a press release dated April 20, 2023, Sunnova announced a conditional commitment by the U.S. Department of Energy ("DOE") Loan Programs Office ("LPO") to provide an up to a $3.0 billion partial loan guarantee, which the Company said equated

to a 90% guarantee of up to $3.3 billion of financing to support loans originated by Sunnova under a new solar loan channel named "Project Hestia." Sunnova stated that Project Hestia would provide disadvantaged individuals and communities with increased access to Sunnova services by indirectly and partially guaranteeing the cash flows associated with those consumers' loans.

11. The DOE's LPO has a rigorous application process that requires companies to demonstrate their financial health, technological viability, and ability to responsibly manage government-backed projects. But Sunnova, aware that its history of predatory sales practices and customer service failures would jeopardize its chances of obtaining the loan guarantee, did not disclose in its public filings its widespread misconduct during the application process. And as stated above, it publicly affirmatively misrepresented the Company as a trustworthy and socially responsible provider of clean energy access to underserved communities. The Company continued to do so after April 20, 2023, representing that Sunnova provides "responsive and reliable service to our valued customers," "unwavering commitment to providing exceptional customer services that helps set us apart in our industry," and that at "Sunnova we are committed to leading with integrity, fostering a culture of honesty, maximizing performance, and embracing ethical business practices."

12. In August 2023, Sunnova took advantage of the DOE conditional commitment to sell 5,865,000 shares of common stock at an artificially-inflated public offering price of $14.75 per share. Sunnova received aggregate net proceeds of approximately $82.2 million, after deducting underwriting discounts and commissions of approximately $3.9 million and offering expenses of approximately $400,000.

13. Sunnova's efforts succeeded when, on September 28, 2023, the Company issued a press release announcing that it had entered into the LPO Loan. Defendants' material

misrepresentations and omissions were key to deceiving the DOE, allowing Sunnova to secure the massive financial benefits of the partial loan guarantee, which included government backing that significantly lowered its borrowing costs for Project Hestia. The loan guarantee also provided a major reputational boost for Sunnova, giving it the imprimatur of a trusted government partner and innovator in clean energy equity. This fact helped further the Company's growth narrative and stock promotion. These ill-gotten benefits crystallized when the loan guarantee closed in September 2023. But the loan guarantee was put at risk when Sunnova's misconduct was exposed just two months later.

14. On November 22, 2023, The Washington Free Beacon put on its website an article entitled "Biden Admin Gave $3 Billion Loan to Solar Company Accused of Scamming Elderly." The article stated that numerous consumer complaints had been brought against the Company for issues ranging from maintenance delays to predatory sales tactics used against elderly and disabled homeowners.

15. Then, in a letter dated December 7, 2023, Representative Cathy McMorris Rodgers, Chair of the U.S. House Committee on Energy and Commerce ("House Energy Committee"), and Senator John Barrasso, ranking member of the U.S. Senate Committee on Energy and Natural Resources ("Senate Energy Committee"), sent a letter to the DOE seeking information related to the LPO Loan and Project Hestia following the release of the "disturbing" reports regarding the Company. Specifically, the letter requested additional information regarding the LPO's awareness of and treatment of Sunnova's allegedly predatory business practices and poor service provided to customers. The letter also expressed concern about the potential conflict of interests for LPO director Jigar Shah, who, before he joined the Biden administration, founded and led a trade association called Cleantech Leaders Roundtable, which shares a board member with Sunnova.

This letter was widely publicized in the press, including on Fox News and Seeking Alpha, among other places.

16. On this news, Sunnova's stock price fell $2.00 per share, or 16.12%, to close at $10.41 per share on December 8, 2023. Several sources attributed the sharp decline in Sunnova's stock price to the revelations about its sales and services malfeasance and the congressional inquiry about what had occurred. For example, a December 11, 2023 J.P. Morgan analyst report on Sunnova stated that Sunnova's stock price on December 8, 2023 "traded down [approximately] 16% . . . on the news" that members of the House and Senate Energy Committees sent a letter to the DOE's Loan Programs Office stating that they are "alarmed by 'disturbing' consumer complaints against NOVA regarding its sales practices" and seeking documents related to the $3 billion loan partial loan guarantee granted to Sunnova. Immediately after the reports that led to the stock decline, J.P. Morgan reported that in a call, Sunnova CEO Berger agreed that "the company owns the customer experience and has accountability for its dealers." But he stated confidence in its sales and service practices, defending them against the accusations. Nonetheless, despite these public-facing statements of confidence in the sales and services of the Company, according to a former employee, in a Company-wide meeting in spring 2024, during a discussion involving both CEO Berger and Executive Vice President and Chief Operating Officer ("COO") Paul Mathews, they acknowledged the service issues and numerous BBB consumer complaints, and stated that Sunnova had been working to address the issues that led to those complaints.

17. The financial effects of Defendants' false statements and deceptive conduct were further revealed on February 21, 2024, when the Company reported its Q4 2023 earnings, which showed a material and unexpected increase in operating expenses, or "OpEx," which stemmed in part from efforts to remediate widespread and previously undisclosed customer service issues. The

increase in OpEx from Q3 2023 to Q4 2023 was $54.2 million, the largest ever quarterly increase in OpEx. Similarly, the Company's related non-GAAP metric of adjusted operating expenses also increased by $18.4 million, or 19.2%, from the prior quarter.

18. The next day, in the morning before the market opened, the Company held an investor conference call. According to Wall Street analysts, the increase in Sunnova's OpEx was, in part, attributed to the ongoing and persistent customer service issues facing the Company. Wall Street analyst Phillip Shen remarked, "Shifting over to OpEx, it looks like the adjusted OpEx went up meaningfully in Q4." Shen also asked, "Can you share, what the outlook is specifically for the customer service and sales and marketing line items, which were each quite high on an absolute dollar basis in Q4. Can you talk about how these line items may trend and scale ahead? Thanks."

19. CEO Berger responded to Shen, in relevant part, by acknowledging that the Company needed to "catch[] up on the [customer] service levels that we have promised our customers . . . [and] once we've cleared that backlog which we've done will be -- we're seeing a cost reduction on a per customer basis that's pretty meaningful."

20. Separately during the Q4 2023 earnings call, Defendant Berger admitted that, with respect to the Sunnova dealer issues, "There's been a couple of stumbles on some dealers. Quite candidly, ***we saw those coming*** . . . ." Indeed, Sunnova stated in its July 2020 Prospectus that "a differentiated residential dealer model," as opposed to having an in-house sales team, is a "structure [which] provides operational flexibility[] . . . and ***lower fixed costs relative to our peers***, furthering our competitive advantage." But undisclosed to stakeholders, these relatively lower costs came at a price of predatory sales practices and poor service, which eventually had to be remediated.

21. On all this news, Sunnova's stock fell $2.81 per share, or 24.6% on massive volume (22.3 million shares) on February 22, 2024, to close at $8.57 per share. Selling continued the next day, and Sunnova's stock continued to decline the following day, by $1.13 per share, or 13.1%, to close at $7.44 per share, also on very heavy volume (20.9 million shares).

22. On April 3, 2024, the DOE Office of Inspector General responded to the congressional inquiry about the LPO's partial loan guarantees to Sunnova, despite the reported predatory sales practices and service problems. The Inspector General stated that it was evaluating the concerns raised about the conflicts of interests that led to the "Sunnova loan guarantee."

23. On May 1, 2024, an article published by Bloomberg reported that the Company had engaged investment bank Moelis to advise the Company on strategic alternatives related to its balance sheet as the Company's convertible bonds traded at roughly 43 cents on the dollar.

24. Also on May 1, 2024, the Company announced the termination of CFO Lane. CEO Berger is quoted as stating that it was a "logical time" for a CFO transition.

25. On all this news, Sunnova shares fell $0.68 per share, or 16.1%, from $4.21 to $3.53 per share on May 2, 2024, on heavy trading volume.

26. Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Sunnova routinely engaged in predatory business practices against disadvantaged homeowners and communities—the same groups that Project Hestia was purportedly intended to benefit; (ii) the foregoing conduct subjected the Company to a heightened risk of regulatory and/or governmental scrutiny, as well as significant reputational and/or financial harm; and (iii) as a result, the Company's public statements were materially false and misleading at all relevant times.

27. Additionally, the Company (i) concealed that it was routinely failing to provide sufficient customer service, which created a growing, yet undisclosed, backlog of customer service complaints that would eventually need to be paid; (ii) affirmatively made misleading statements about the Company's efforts to service customers by, *inter alia*, stating that they Company "do[es] well" on customer service and/or touting 4.5 star reviews on certain customer service ratings providers (*e.g.*, Google) without acknowledging or disclosing widespread complaints on different customer service rating providers (*e.g.*, the Better Business Bureau); (iii) affirmatively made misleading statements about the Company's reliability; and (iv) both affirmatively and by omission made misleading statements about the Company's operating expenses (*i.e.*, OpEx)[2] in light of significant hiring intended to address customer service failures, while actively representing that operating costs per customer were expected to decline, among others further alleged herein.

28. Yet before the truth was fully revealed, Defendants made substantial sales of their holdings in Sunnova stock. For instance, CEO Berger reaped proceeds of more than $8.6 million at an average price of $27.63 per share, more than 7.8 times the $3.53 per share price on the first day following the Class Period. Similarly, CFO Lane reaped more than $1.1 million in proceeds at an average price of 22.04 per share, or more than 6.2 times the share price on the first day following the Class Period.

29. As a result of Defendants' wrongful acts, misrepresentations, half-truths, and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

[2] For clarity, "operating expenses" and "operating costs" mean the same thing. In the industry, and at times by the Company, the two terms are used interchangeably.

## II. JURISDICTION AND VENUE

30. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and SEC Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

31. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

32. Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). Sunnova is headquartered in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' alleged actions took place within this Judicial District.

33. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and the facilities of the national securities markets.

## III. PARTIES

### A. Plaintiffs

34. Lead Plaintiff Christopher Scott Berger is an individual investor. As set forth in the certification previously filed in this action, which is incorporated herein by reference, Lead Plaintiff Berger purchased or otherwise acquired Sunnova common stock during the Class Period and was damaged by Defendants' violations of the federal securities laws alleged herein. By order dated May 20, 2024, the Court appointed Mr. Berger and Mr. Lueshen to serve as Lead Plaintiffs in this action. ECF No. 43.

35. Lead Plaintiff Landon Lueshen is an individual investor. As set forth in the certification previously filed in this action, which is incorporated herein by reference, Lead

Plaintiff Lueshen purchased or otherwise acquired Sunnova common stock during the Class Period and was damaged by Defendants' violations of the federal securities laws alleged herein. By order dated May 20, 2024, the Court appointed Mr. Berger and Mr. Lueshen to serve as Lead Plaintiffs in this action. ECF No. 43.

36. Plaintiffs, as set forth in their Certifications, acquired Sunnova securities at artificially inflated prices during the Class Period and were damaged upon the revelation of the alleged corrective disclosures.

**B. Corporate Defendant**

37. Defendant Sunnova Energy International Inc. is a Delaware corporation with principal executive offices located at 20 East Greenway Plaza, Suite 540, Houston, Texas 77046. Sunnova's common stock trades in an efficient market on the New York Stock Exchange ("NYSE") under the ticker symbol "NOVA."

**C. Individual Defendants**

38. Defendant William J. Berger ("Berger") has served as Sunnova's CEO at all relevant times. Defendant Berger also serves as the Company's Chairman of the Board and President. Defendant Berger signed each of Sunnova's 10-Ks during the Class Period.

39. Defendant Robert L. Lane ("Lane") has served as Sunnova's CFO at all relevant times. Defendant Lane also serves as the Company's Executive Vice President. According to Sunnova SEC filings, Lane was an investment banker and equity research analyst covering the energy industry before joining Sunnova. Mr. Lane is also a Certified Public Accountant and a Chartered Financial Analyst. Defendant Lane signed each of Sunnova's 10-Ks during the Class Period.

40. Defendants Berger and Lane are sometimes referred to herein collectively as the "Individual Defendants."

41. The Individual Defendants possessed the power and authority to control the contents of Sunnova's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of Sunnova's SEC filings and press releases alleged herein to be misleading prior to, or shortly after, their issuance, and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with Sunnova, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

42. Sunnova and the Individual Defendants are collectively referred to herein as "Defendants."

## IV. FACTUAL ALLEGATIONS

### A. General Background

43. Sunnova provides energy as a service in the United States. The Company offers solar electricity, as well as operations and maintenance, monitoring, repairs and replacements, equipment upgrades, on-site power optimization, and diagnostics services of such solar-powered equipment. It commenced operations in January 2013 and began providing solar energy services in April 2013. On July 25, 2019, Sunnova's shares began trading publicly through an initial public offering, raising $170 million at an offering price of $12 per share. Sunnova was the first major U.S. solar company to go public since Sunrun in 2015.

### B. Sunnova Recklessly Turned a Blind Eye to Improper Business Practices Because Relying on Dealers to Add Customers Was Cheaper in the Short-Run

44. While many of its competitors maintained a large, geographically diverse base of employees in local markets, including a direct sales force comprised of home improvement installers, Sunnova limited its direct costs by utilizing a network of local, independent dealers to market, sell, and install solar energy systems and energy storage systems on its behalf. Its dealers typically reside and work within the markets they serve and "provide a localized, customer-focused marketing, installation and servicing process." Sunnova Form 10-K for fiscal year ended December 31, 2019 ("2019 10-K") at 5. Nearly 70 percent of Sunnova's business was then concentrated in three markets: New Jersey, California, and Puerto Rico.[3] The Company said it would look to new geographies, but also planned to increase its penetration in its existing markets.[4] However, even though dealers were less costly to Sunnova than maintaining equivalent staff in-house, analysts still remained concerned about the high cost of customer acquisition compared to its competitors.[5]

45. As stated in the 2019 10-K, Sunnova has been dependent on its dealer network and the functions those dealers provide for the Company, which is a material aspect of its business model. The Company explained in its July 2019 Prospectus that its "dealer network is an integral component of our business strategy and serves as the means by which we are able to originate solar service agreements and related solar energy systems and energy storage systems in existing and prospective markets." July 2019 Prospectus at 22. The Prospectus also states, "Our growth is

---

[3] Emma Foehringer Merchant, "Sunnova Raises $170M in First US Solar IPO in Years," Greentechmedia.com (July 26, 2019), https://www.greentechmedia.com/articles/read/sunnova-completes-first-day-of-trading-with-drop-in-share-price (last accessed June 28, 2024).

[4] *Id.*

[5] *Id.*

dependent on our dealer network, and our failure to retain or replace existing dealers or to grow our dealer network could adversely impact our business. In addition, one of our dealers currently accounts for approximately half of our recently added customers." *Id.* The Company stated that the "dealer network is an integral component of our business strategy and serves as the means by which we are able to rapidly and successfully expand within existing and prospective markets." *Id.* at 38. Sunnova repeated in other filings during the Class Period that it relied on its dealer network, particularly for growing the business. *See, e.g.*, Sunnova Form 10-K for the fiscal year ended December 31, 2020 ("2020 10-K") at 3.

46. Indeed, Sunnova's sales depended on its dealers. In fact, between December 31, 2021, and December 31, 2022, there was a 97% correlation between Sunnova's total customers and its dealers (including sub-dealers and new homes installers).

| | 12/31/2021 | 3/31/2022 | 6/30/2022 | 9/30/2022 | 12/31/2022 |
|---|---|---|---|---|---|
| Sunnova's total customers (in thousands) | 193 | 208 | 225 | 247 | 279 |
| Sunnova's total dealers* (RHS) | 814 | 915 | 986 | 1033 | 1116 |
| Correlation | 97.3% | | | | |

Source: Company filings, correlation calculated by Microsoft Excel



47. According to Wall Street analysts, Sunnova's dealers helped fuel Sunnova's customer growth. For example, an April 27, 2023 J.P. Morgan report regarding Sunnova's Q1 2023 results stated, "NOVA added 30.1k customers during 1Q, well ahead of our estimate of 24.0k, with y/y growth in each market. We believe the strength was driven by both an increase in the dealer count as well as new customers per dealer."

48. Sunnova represented that it "provid[ed] comprehensive training to dealers," who "[w]e carefully recruit [and] must meet and maintain our standards to be an approved dealer." July 2020 Prospectus at 121-22. These assurances about training and the necessity of approved dealers to meet and maintain Sunnova's standards were repeated during the Class Period. *See, e.g.*, 2020 10-K at 8, 9. The July 2020 Prospectus stated in detail, "We provide training, field support and continuing education to help our dealers operate efficiently. This includes training related to our processes, standards and services platform, sales training and compliance education regarding applicable rules and regulations. We actively review our dealers' performance and compliance with our requirements to determine whether to terminate our relationship with any dealer that is unable to meet our performance standards." July 2020 Prospectus at 122. In addition to stating that it was providing extensive training and oversight of dealers, Sunnova represented that "[b]efore proceeding to the design phase, ***we validate*** that every customer understands the terms of their contract with us as well as the expected benefits of the system." *Id.* at 121.

49. And while Sunnova represented that it vetted its dealers, statements by former employees tell a different story of aggressive pressure and targets on dealers to close deals, dealers that were approved rapidly, dealers that delegated the training (not Sunnova), loose approval confirmatory processes that lead to predatory sales practices, and the significant number of customers complaints about Sunnova and its dealers. For example, Former Employee 1 ("FE 1")

worked for Sunnova from the beginning of 2022 to the summer of 2023, had responsibilities related to onboarding and training dealers and meeting with dealers to address their concerns and complaints of customers, had reports who were responsible for interacting and assisting dealers, and also met with other employees with responsibilities related to dealers. FE 1 was the Vice President, Dealer Experience and Performance, and reported to Mark Delaney, Senior Vice President of Dealer Sales and Operations. FE 1 stated that if a dealer committed to selling a certain number of systems, Sunnova provided upfront payments for the dealer's operations. When a dealer obtained the upfront payments, the dealer was obligated to sell the number of systems it had committed to within a certain period. If the dealer failed to sell that number of systems, Sunnova could "claw back" the upfront money. That created tremendous pressure on Sunnova employees and dealers because CEO Berger set "astronomical" sales targets that were significantly higher than the SVP of Dealer Sales and Operations, Mark Delaney, proposed. SVP Delaney expressed frustration at these sales targets.

50. FE 1 also stated that most dealers who requested to sell Sunnova systems were permitted to do so, estimating that 80 percent who applied were approved. Dealers faced tremendous pressure from the Company and for their own benefit for sales. The potential for problems was magnified by the fact that, according to FE 1, dealers appear to have been approved rapidly and the dealers (not Sunnova) were responsible for training their individual salespeople. FE 1 was not aware of a process by which Sunnova reviewed a dealer's salespeople before their hiring or work in the field. FE 1 stated that the potential for problems was magnified because Sunnova only confirmed the terms of a deal through a non-video call where the "customer" answered a checklist of questions. FE 1 heard from others about salespeople using someone who was not the customer to take the welcome call from Sunnova and fraudulently confirm the terms.

FE 1 explained that other companies use a digital camera to view the customer's face during the confirmatory call. FE 1 stated that they heard from the customer support team at Sunnova about predatory sales practices and the significant number of customers complaints about Sunnova and its dealers. FE 1 believed that everyone at the Company knew about the significant number of customer complaints.

51. Former Employee 2 ("FE 2") worked in product management positions for Sunnova from fall 2021 to fall 2023. In those positions, FE 2 interacted with dealers and other Sunnova employees who interacted with dealers, particularly as it related to products used in the solar energy systems, including those installed for Sunnova customers. FE 2 stated that when a network dealer installed a solar system that did not meet Sunnova's engineering requirements, Sunnova's sales leadership repeatedly approved the system anyway, and that SVP of Dealer Sales and Operations Delaney was often the person advocating for the non-conforming systems on behalf of dealers who wanted to be paid (versus customers). FE 2 stated that John Santo Salvo, VP/Chief Commercial Officer and Chief Procurement Officer, and Kris Hillstrand, COO, who reported to CEO Berger, would make the call about whether to approve a system that engineering flagged as not meeting requirements. FE 2 believed that, given the circumstances and the decisions made by FE 2's direct reports, CEO Berger must have known about these issues. FE 2 also stated that Sunnova was pushing "very aggressive" sales targets, and FE 2's understanding was that the sales leadership wanted to keep its dealers happy, paid, and selling more systems. FE 2 also agreed that Sunnova, during FE 2's tenure, did not have the service infrastructure in place to handle the extreme growth in customers that came with the company's aggressive sales targets.

52. Former Employee 3 ("FE 3") is a former Sunnova employee who worked at the Company from close to the beginning of 2023 to the end of spring 2024. FE 3 was a Business

Development Manager responsible for one region of the country. FE 3 reported to Lisa Diamantis, Director of Recruiting and Onboarding. FE 3 worked directly with Sunnova's dealers on many aspects of their employment, from their recruitment to sales and was involved with Sunnova business development. FE 3 confirmed the statements of others that Sunnova set sales targets for their dealers, regularly checked in with them about hitting those targets, and that if they did not, they could potentially lose access to Sunnova's sales platform and financing. FE 3 also stated that dealers who sold more systems could receive better pricing for installs, which improved their profits, and dealers who agreed to exclusivity deals with Sunnova received better pricing. Dealers who signed contracts with Sunnova committing them to specific sales numbers received better pricing for installs. In addition to the Sunnova sales platform, Sunnova dealers also had access to Sunnova's financing terms, which in years past were often the best in the industry. FE 3 stated that in interactions with dealers, FE 3 learned that a main point of getting on the Sunnova platform was to grow your numbers, and that Sunnova imposed sales targets that grew. FE 3 stated that Sunnova exerted insufficient direct control over the salespeople hired by the dealers and that Sunnova often did not learn about problems until after those arose.

53. But by relying on lower-cost dealers, Sunnova recklessly traded quality control for lower costs. In the process, Defendants' actions prompted a widespread customer service problem that needed to be fixed, but investors were not told.

**C. Predatory Sales Practices, Poor Service, and Widespread Consumer Complaints**

54. Months before its initial public offering, in February 2019, the PREB, an oversight agency for Puerto Rico, issued a report against Sunnova that identified 436 complaints against the Company about misleading and predatory sales practices. The report concluded that "Sunnova's practices during the contracting process are not consistent with the obligations that power company have" under Puerto Rican law. The complaints dated back several years and reportedly included

allegations that customers thought they were agreeing to a credit check, ***but instead had signed up for a 25-year contract with Sunnova***; Sunnova misled customers on potential savings with their solar panels; and Sunnova did not fully reveal costs of solar panel financing to customers. The problems with Sunnova escalated after Hurricane Maria ravaged Puerto Rico in September 2017. Sunnova opposed the investigative process and stated that it had addressed the concerns raised in a supplemental response it filed with the Puerto Rico Public Service Regulatory Board.[6] Regardless, in a resolution and order issued in December 2020, the PREB upheld its conclusions and ordered the end of the investigation. It found that Sunnova's representations that it adequately trains and supervises its local partners—*i.e.*, dealers—were false. The PREB ordered Sunnova to develop a protocol to disclose its full business information before clients sign contracts and to process billing objections without requiring arbitration. All Sunnova publicly disclosed about these proceedings in its July 2019 Prospectus was, "The Puerto Rico Energy Bureau has instituted administrative proceedings regarding customer complaints about our Puerto Rican operations, the operations of some of our dealers in Puerto Rico and certain Sunnova policies and procedures relating to contract disclosures and invoice disputes in Puerto Rico." July 2019 Prospectus at 37. It also stated elsewhere in these offering documents a general risk disclosure:

> We depend significantly on our reputation for high-quality products, excellent customer service and the brand name "Sunnova" to attract new customers and grow our business. If we fail to continue to deliver our solar energy systems or energy storage systems within the planned timelines, if our offerings do not perform as anticipated or if we damage any of our customers' properties or delay or cancel projects, our brand and reputation could be significantly impaired. Future technological improvements may allow us to offer lower

[6] Supplementary Statement to the Response From Sunnova Energy Corporation to the Notice of Non-Compliance, *In re Sunnova Energy Corp.*, Case No. NEPR-AI-2019-0001 (Apr. 22, 2019), available at https://www.sunnova.com/-/media/Files/pdfs/sunnovafacts/Sunnova-Supplemental-Responses-NEPR-AI-2019-04-23-Confidential-Info-English.ashx (last accessed June 28, 2024).

> prices or offer new technology to new customers; however, technical limitations in our current solar energy systems and energy storage systems may prevent us from offering such lower prices or new technology to our existing customers. The inability of our current customers to benefit from technological improvements could cause our existing customers to lower the value they perceive our existing products offer and impair our brand and reputation.
>
> In addition, given the sheer number of interactions our personnel or dealers operating on our behalf have with customers and potential customers, it is inevitable that some customers' and potential customers' interactions with our company or dealers operating on our behalf will be perceived as less than satisfactory. This has led to instances of customer complaints, some of which have affected our digital footprint on rating websites and social media platforms. If we cannot manage our hiring and training processes to avoid or minimize these issues to the extent possible, our reputation may be harmed and our ability to attract new customers would suffer.

July 2019 Prospectus at 39.

55. These statements were repeated in the July 2020 Prospectus at 41-42; the 2019 10-K at 33; the 2020 10-K at 39-40; the Sunnova Form 10-K for the fiscal year ended December 31, 2021 ("2021 10-K") at 26; the Sunnova Form 10-K for the fiscal year ended December 31, 2022 ("2022 10-K") at 27; and the Sunnova Form 10-K for the fiscal year ended December 31, 2023 ("2023 10-K") at 26.

56. Unbeknownst to investors, Sunnova's tolerance for predatory practices continued, as did its poor customer service. For example, between January 31, 2020, and December 29, 2022, there were more than forty complaints submitted to the Texas Attorney General's Office by consumers about predatory sales practices and poor service by Sunnova. According to a summary spreadsheet obtained by Plaintiffs' counsel through a public records act request to the Texas Attorney General's Office, these complaints were submitted by consumers in multiple states, including New Jersey, New York, California, and Texas. Sunnova was the named Respondent on these complaints.

57. From January 2022 to the end of September 2023, another 55 complaints were submitted to the Texas Attorney General's Office about Sunnova's predatory sales practices and failure to provide adequate service. Another summary spreadsheet obtained through a public records act request made to the Texas Attorney General's Office described such complaints being submitted by consumers in several states, including Texas, New Jersey, Massachusetts, Florida, and Nevada. Sunnova was the named Respondent on these complaints as well.

58. Specifically, as to customer service, the Public Records Act request showed that customers complained about issues ranging from Sunnova's refusal to repair a system that failed an inspection, to an instance where Sunnova "basically did nothing but say it was under review" after a customer asked Sunnova for assistance with an issue on their roof related to solar panels.

59. One customer from Arizona submitted a complaint on July 29, 2022, that described persistent delays and multiple instances of being misled by Sunnova (the bracketed text below appeared in the spreadsheet produced by the public records act request):

> In Feb. 2022 we discovered need to repair the roof due to damage from hail. We contacted Sunnova to request remove/re-install invoice so that we could proceed. They assigned a case number in March. They then basically did nothing but say it was under review. At one point a couple months later they told me that the company they contacted to do the work does not work in my area. After many phone calls and emails, we in July we got a quote [dated 6/10/22]. I had previously been informed by a Curtis Turner of the amount by phone and that they found a contractor and by email quote which had no payee, no date, no company name. He wanted me to pay him directly, but I said it needed to come out of my insurance funds and I need an invoice. Since then I have only received 'quote' without dates, company, nor payee or received messages saying it is under review. I have been variously told in emails or by phone that an invoice was sent [was not], that it is under review, that it is a closed case [not], that they have tried to call me unsuccessfully and I should call [they never called at those times], that they do all their business digitally and only will get a work order if pre-paid off the [unidentifiable] quote, etc. I have the email trail available if you want to see it. I can forward them to your email if you want and if you give me that email. The Better Business Bureau complaint got the same responses from an Ignacio Herrera of under review and quote was sent. His boss,

> Martha, reassured me that they would expedite, but I have no way to get back with her and it is not expedited. BBB case still open. I suggested to BBB and Sunnova customer care folk that Sunnova could help by allowing me to use the solar experts working with my roofing company without any adverse impact on my contract. They have not responded in any fashion to that suggestion.

60. Another customer, who complained in January 2021, stated:

> Sunnova installed solar panels on my house in late 2020. Encore did the inspection on 10/21/20 and failed it due to the fact they ran wires through Encore's meter. I have been trying since then to get a Sunnova technician out to make the needed changes. Without them I am unable to receive credits for the power I am supposed to be providing the grid. I have made 11 (soon to be 12) payments of $212 and I am still paying for full electric. The panels are effectively useless until a Sunnova technician re-runs these wires.
>
> ***Sunnova has yet to tell me when they will fix this and refused refunding me the money I have paid to date for an incomplete installation***. They have also refused to put me in contact with a manager or anyone else capable of making decisions. I can never get past the 1st level consumer support.

61. Another customer in Texas wrote in October 2022 that she paid Sunnova $1,000 to transfer herself off the lease after selling her home and was told that she could get the money back after one year. The customer waited the year and again demanded the refund. The customer was told that Sunnova would have to do a billing inquiry, but as of the time of the October 2022 complaint, Sunnova had apparently still not responded to this customer, according documents produced in response to a public records request.

62. Another customer from Texas (different from those above) made a complaint in November 2022, stating:

> This company ***refuses to fix the solar equipments*** [sic] ***it's contracted to maintain***. It creates work orders and then subsequently cancels them at the last minute and cannot give me an explanation. The equipment stopped working in February and I have steadily asked for reimbursement and for maintenance and they create work orders in name only with no interest in fixing the equipment. There have been 4 work orders in the past 6 weeks

> that they created and canceled. The equipment didn't work from the initial install.
>
> They continue to create work orders in response to pacify me and then literally cancel them at the last minute. The last work order was supposed to happen on 11.4.2022 at 4pm and they called to cancel on 11.4.2022 at 2:10pm. This has been going on since February and it's ridiculous. In the last 6 weeks they have created and canceled 4 work orders. When I call to ask for an explanation, even their management cannot tell me why. So it appears that they are creating them solely in name only but not to actually fulfill them.

63. Yet another Sunnova customer complained in February 2023 that he's faced persistent maintenance issues and cannot get Sunnova to address them:

> I financed solar panels thru this company. They are responsible as per contract to maintain the panels. ***My panels have not worked consistently for years!*** My productivity has declined every year. Not to mention my bill has escalated in price over the years. I've called , emailed, wrote letter etc.. Same response every time is they are "working". Electric bills do not reflect their response. ***I can't get anyone to discuss my issues***.

64. The samples above are representative of Sunnova's larger customer service failures, but they are a tiny subset of the dissatisfied customer base. In fact, the complaints about Sunnova were so rampant that in June 2023, Leah Napolietto, the vice president of investigations and public affairs with the Better Business Bureau of Houston, South Texas, stated that the "company currently has an F rating with the BBB." The BBB, in fact, issued an alert for Sunnova, citing a pattern of complaints, including deceptive sales practices, poor customer service, and technicians who do not arrive as scheduled. The BBB also stated that, beginning in 2022, Sunnova received numerous complaints.

65. A further peek at the rampant nature of the complaints about Sunnova's predatory sales practices and service deficiencies is also apparent from a more recent review of the Sunnova

page on the website of the local BBB of Houston and South Texas.[7] The BBB provides the following alert about the "Pattern of Complaint" for Sunnova:

> Since 2022 to date, The BBB of Greater Houston & South Texas received numerous complaints and customer reviews for Sunnova Energy Corporation exhibiting patterns of complaints and customer reviews. A review of the pattern in 2023 into 2024 was completed which revealed the following patterns: Customer[] complaints and customer reviews alleged deceptive sales practices, poor customer service and they further report installation and repair technicians do not arrive as scheduled. Customer complaints also alleged delays in diagnosing and repairing under-producing panels or panels that are not operational at all. Some consumer[s] filed complaints stating the company will not schedule panels to be removed for roof replacement even after paying upfront for the service. The BBB has also received complaints alleging the company has failed to transfer lease agreements from the seller of homes to the new purchasers.[8]

66. The BBB website also makes clear that the Defendants are well aware of these complaints: "Sunnova Energy Corporation has stated in media, 'We are working closely with the BBB to have our accreditation reinstated.' However, the BBB is not able to work with Sunnova Energy Corporation at this time to have accreditation reinstated as the business currently does not meet the BBB's Standards for Accreditation."[9] The BBB website details more than 1,300 of these complaints as of the end of January 2024 about deceptive sales practices, poor customer service, and other service problems, with complaints available to view from as far back as June 29, 2021, and continuing into 2022, 2023, and 2024. A substantial number of these complaints—including the one on June 29, 2021—list responses from Sunnova indicating Defendants' knowledge of how widespread and pervasive the problems and consumer complaints have been for years.

---

[7] *See* "Sunnova Energy International Inc.," Better Business Bureau, https://www.bbb.org/us/tx/houston/profile/solar-energy-design/sunnova-energy-international-inc-0915-90035524 (last accessed on June 28, 2024).

[8] *Id.*

[9] *Id.*

67. As discussed in the previous section, FE 3 is a former Sunnova employee who worked at the Company from the beginning of 2023 to the end of spring 2024. FE 3 was a Business Development Manager responsible for one region of the country. FE 3 reported to Lisa Diamantis, Director of Recruiting and Onboarding. FE 3 worked directly with Sunnova's dealers on many aspects of their employment from their recruitment to sales and he was involved with Sunnova business development.

68. FE 3 also regularly attended Company meetings, including by Zoom. FE 3 recalls Defendants, and CEO Berger in particular, introducing Paul Mathews[10] in a townhall-style company meeting in February 2023 as the person who would attempt to tackle the Company's service problems and beef up the Company's service terms. Although he was not employed with Sunnova at the time, FE 3 understood from conversations with Ms. Diamantis that Sunnova hired Ms. Diamantis as Director of Recruiting and Onboarding in May 2022 to attempt to improve the Company's vetting process for dealers. FE 3 heard that Sunnova had been more focused on signing on as many dealers as possible to sell its systems than on thoroughly vetting the systems and that the Company would bring on applicant dealers as long as they met a few minimum requirements. FE 3 was aware of the numerous complaints against Sunnova, including complaints about technical problems, long delays on service requests, and predatory sales practices. FE 3 recalled that in 2023, the BBB had a backlog of more than 1,500 customer complaints against Sunnova.

69. FE 3 also provided other information about the Company's business model, which, *inter alia*, created the incentives for poor customer service. FE 3 explained that Sunnova made its money from financing the installation of solar panel systems installed by its dealers. The Company

[10] Paul Mathews became Executive Vice President–Service and Supply Chain for Sunnova in January 2023.

did not earn money from servicing those systems, though it took on the responsibility for doing so.

70. Former Employee 4 ("FE 4") worked at Sunnova from December 2021 to October 2023 in the following positions: Account Manager, Strategic Accounts (December 2021 to June 2022) and General Manager of the West Region (June 2022 to October 2023). FE 4 reported to Mark Delaney, SVP Dealer Sales and Operations. In the former position, he worked with dealers, including one large dealer, and was involved in the recruitment and training of dealers.

71. FE 4 said he was aware of customer complaints about misrepresentations by salespeople. FE 4 was aware of instances of sales representatives coaching customers on how to answer questions during the "welcome call" from Sunnova that was supposed to be used to confirm the customers' understanding of the contract they were signing. Customer complaints that became threats to sue were referred to Sunnova's legal department.

72. Hawaii was part of FE 4's region, and the service provided on Sunnova systems in Hawaii was "horrific," because Sunnova had insufficient employees there. Some customers called for service, but requests went "months and months and months" without resolution. FE 4 said some service requests were checked off as completed when they were not.

73. In about October or November 2022, FE 4 traveled to Hawaii with Mr. Delaney and John Santo Salvo, EVP, Chief Commercial Officer, and Chief Procurement Officer, so the executives could see the service problems there firsthand.

74. FE 4 said discussions about the service problems in Hawaii were a regular topic of discussion in weekly meetings he had with the Company's other General Managers and senior management. "That became a focus." FE 4 said that Delaney and Santo Salvo also had regular

meetings with the Company's leadership—meetings attended by CEO Berger and CFO Lane—and at these meetings, leadership discussed the service problems in Hawaii.

75. As other witnesses stated, FE 4 also stated that he understood that Berger brought Paul Mathews into Sunnova to address the company's extensive service problems.

76. FE 4 stated that dealers who made volume commitments were under pressure to hit those sales numbers or risk Sunnova "clawing back" upfront money the company had provided the dealer. Even so, FE 4 also stated that Sunnova's senior leadership sometimes upwardly adjusted the sales team's projections.

**D. While Facing Growing and Widespread Customer Complaints, Defendants Told Investors to Expect Declining Operating Costs and, Thus, Expanding Profitability**

77. After installing a Sunnova solar energy system, sometimes the system would require maintenance or repair. Such maintenance and/or repair costs money and, depending on whether the customer, dealer, or Sunnova has to pay for those repairs, the costs could potentially erode Sunnova's profitability.

78. Hiring employees also costs money (more money than relying on dealers), increases operating expenses ("OpEx"), and erodes profitability. Employee expenses hit Sunnova's income statement within Sunnova's General & Administrative expense on the Company's income statement, oftentimes referred to as "G&A." According to the Company's 2022 10-K, "When services for maintaining and servicing solar energy systems are provided by Sunnova personnel rather than third parties, those amounts are included in payroll costs classified within general and administrative expense." The Company also stated that "General and administrative expense represents costs for our employees, such as salaries, bonuses, benefits and all other employee-related costs, including stock-based compensation, professional fees related to legal, accounting, human resources, finance and training, information technology and software

services, marketing and communications, IPO costs, acquisition costs, travel and rent and other office-related expenses."

79. Yet, with knowledge of widespread customer complaints and increasing hiring of employees to address such complaints—both of which would increase expenses (including OpEx) and decrease profitability—Defendants told investors that the Company was "doing well" on customer service (when it was not) and that investors could expect *declining* operating expenses (when increasing operating expenses were required to fix the problems of which Defendants were aware).

80. On November 17, 2022, Sunnova hosted an analyst day for investors in Houston (the "2022 Analyst Day"). During that analyst day, which began in the morning on the 17th, Defendants made numerous false and/or misleading statements about the Company's customer service, cost per customer, and purported positive reviews that the Company enjoyed on various rating services.

81. For instance, Defendant Berger stated, with respect to customer service, "We're doing well. Customer satisfaction is over at 4.5 out of 5. Google star is 4.1. This is all wonderful. This is great. We do well." Berger's characterization was materially misleading in light of the countless negative reviews regarding customer satisfaction that had been made to the BBB, beginning in 2022, many of which the Company had responded to. Ultimately, the BBB would rate Sunnova an "F," its lowest rating. Sunnova was not doing well on customer satisfaction.

82. Also at the 2022 Analyst Day, Defendant Lane stated, "So we set a goal that we talked about in 2019 that we expected to get as much as 35% reduction in OpEx per customer. By the time we got to 2022, we're on track, right. So we think we're going to get, if not 35%, very close to 35%. But it's a continual process. And we continue to see that ***our cost per customer is***

***declining***. And when I say our cost per customer, I'm talking about ***all our cost[s]***. Not just the cost to service the customer, but ***all the G&A*** and the sales and everything else that goes around that. Again, ***because of the efficiencies*** that Chris is creating for the whole company."

83. Lane's depiction was both false and misleading. It was false because "all costs" were not declining—G&A was increasing, in part because the Company had to hire people to remediate all the customer service issues of which Lane was aware. Lane's depiction was also misleading because it was not "efficiencies" that had been keeping costs lower than where they would have been otherwise—it was because the Company and/or the dealers that it relied upon were ignoring its customers, both in terms of unscrupulous sales and providing poor service, which in turn meant that the Company was not "on track" to reach its cost reduction targets because ultimately the customers would need to be serviced. That growing backlog of customer service costs essentially operated as an undisclosed liability, and that liability, in turn, pressured Sunnova's balance sheet.

84. As an example, when a customer's solar energy system breaks and the Company has to fix it, that cost will erode Sunnova's profitability unless the customer is ignored. But the longer that customer, and others like him, are ignored, the larger the backlog, and thus the larger the looming financial reckoning will be for Sunnova.

85. Yet, Defendants gave investors no reason to suspect such a reckoning was looming. Rather, Defendants indicated that customers were giving the Company 4.5 out of 5 stars, while concealing that the BBB was being flooded with complaints and would eventually rate Sunnova an "F."

86. At the same 2022 Analyst Day, CFO Lane also explained how being a purported service company ultimately flowed to Sunnova's bottom line: "So everything was already in there

but it's that service component that we think we're really going to start to monetize. So, all of this stuff, more leases and PPAs, more services for customer. Yes, more gain on sale is all going to ***be driving adjusted EBITDA***." In other words, Lane touted the potential revenue generation that was possible by providing services that Sunnova could charge for, but concealed the costs that Sunnova would face for services it was obligated to perform but could not charge for.

87. Lane concluded his comments at the 2022 Analyst Day by touting the Company's purported "reliability," "strong balance sheet," and belief that the Company's stock price was "undervalued":

> We have a strong balance sheet, very strong liquidity. We don't need to be going into the market seeking more liquidity right now, well over $1 billion of liquidity at the end of the quarter, and we just did another ABS to help reload some of that liquidity as well. We established positive OCF. We proved that yes, if you were to just take the operating assets and shut down the rest of the company, the company, Sunnova, makes money. And that will only grow, by the way, as we hit flips on our tax equity and as we go past the anticipated repayment dates of our securitizations. And we've also outlined that yes, we believe that there is a path to achieving GAAP-positive earnings and GAAP-positive operating cash flow.
>
> So, we keep talking about we think our company is undervalued. Everybody is going to talk about that. We realize that the financials can be confusing. But at the end of the day, we think the biggest disconnect is that folks don't realize we are a service company. We have a long-term contract and a long-term relationship with the customer. We sell energy independence, reliability, affordability, sustainability, peace of mind, and a promise to be there for our customers.

88. Following these rosy and misleading statements at the 2022 Analyst Day, Sunnova shares rose over the course of the day on November 17, 2022, from an opening price of $22.58 per share, to close at $23.79 by the end of the same day, or 5.35% on significant trading volume.

89. Defendants' misleading statements continued. On July 26, 2023, after the close of market, the Company reported financial results for the quarter ending June 30, 2023 ("Q2 2023"). The following morning, before the market opened, the Company held a conference call with

investors on July 27, 2023, regarding the Q2 2023 earnings results. During the call, Berger touted Sunnova's purported "unwavering commitment to delivering responsive and reliable service":

> Sunnova achieved record growth in customer additions in the second quarter. This outstanding performance can be attributed to the strong demand for our comprehensive suite of services, the continued growth of our dealer base and the expansion of our addressable market and market share. ***What sets Sunnova apart and fuels our growth is our unique business model, exemplified by an unwavering commitment to delivering responsive and reliable service***.

90. Yet, unbeknownst to investors, Sunnova's customer service was neither reliable nor responsive.

## V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

### A. During the Class Period, Sunnova Repeatedly Misled Investors About Its Predatory Sales Practices, Poor Service, Consumer Complaints, Costs, and Its Commitments to Customers and Shareholders

91. In Sunnova's July 1, 2020 Prospectus, filed by Defendants pursuant to Rule 424(b)(4), Registration Statement No. 333-239518, Sunnova noted that the Puerto Rico Energy Bureau had "instituted administrative proceedings regarding customer complaints about our Puerto Rican operations, the operations of some of our dealers in Puerto Rico and certain Sunnova policies and procedures relating to contract disclosures and invoice disputes in Puerto Rico. At this time, we are unable to determine whether the Puerto Rico Energy Bureau will seek penalties against us in the future in connection with these proceedings or require a change in our practices and procedures." *See id*. at 41. Sunnova further stated that "[b]ased on this matter, the U.S. Better Business Bureau listed Sunnova as not accredited," but that, "We have not experienced a material impact as a result of the listing." *Id.* These statements were repeated in other filings during the remainder of the Class Period, including the 2019 10-K (filed February 25, 2020), 2020 10-K (filed February 25, 2021), 2021 10-K (filed February 24, 2022), 2022 10-K (filed February 23, 2023),

and 2023 10-K (filed February 22, 2024). The Company also responded to the complaint, as noted above in Section IV.C, in a filing with the PREB that it was aware of these complaints and had addressed the problems.[11]

92. Defendants' statements in ¶ 91, *supra*, made on July 1, 2020, February 25, 2020, February 25, 2021, February 24, 2022, February 23, 2023, and February 22, 2024, were materially false and misleading, and they omitted material facts that made them further false and misleading. While noting the PREB proceedings and related complaints, the Company did not discuss or acknowledge the continued widespread nature of the consumer complaints, the predatory sales practices and service problems acknowledged within the Company, and the business risks posed by these problems and the Company's heavy reliance on the dealer network that was the subject of numerous customer complaints.

93. Rather, admitting their knowledge of the customer complaints, Defendants stated in the July 2019 Prospectus (and following 10-Ks), after identifying the PREB investigation, that "given the sheer number of interactions our personnel or dealers operating on our behalf have with customers and potential customers," it is "***inevitable*** that some customers' and potential customers' interactions with our company or dealers operating on our behalf will be perceived as less than satisfactory." *Id.* at 34. That includes such statements in the 2020 Prospectus at 42, 2019 10-K at 34, 2020 10-K at 39-40, 2021 10-K at 26, 2022 10-K at 27, and 2023 10-K at 26. When speaking about the "inevitability" of these issues given the sheer volume of interactions with its employees and dealers, Sunnova did not say anything about the widespread nature of the complaints or the

[11] Supplementary Statement to the Response From Sunnova Energy Corporation to the Notice of Non-Compliance, *In re Sunnova Energy Corp.*, Case No. NEPR-AI-2019-0001 (Apr. 22, 2019), available at https://www.sunnova.com/-/media/Files/pdfs/sunnovafacts/Sunnova-Supplemental-Responses-NEPR-AI-2019-04-23-Confidential-Info-English.ashx (last accessed June 28, 2024).

internally acknowledged problems with Sunnova employees and its dealers who were pushing predatory sales practices and providing inadequate service under pressure from "astronomical" sales targets. CEO Berger's knowledge of, *inter alia*, the immense service problems resulted in the decision to hire Mathews.

## B. Defendants Stress the Importance of Monitoring Their Dealer Practice and Training Their Dealers While Omitting Material Information

94. During the Class Period, Defendants also specifically continued to misleadingly laud the Company's dealer model without mentioning the pervasive problems and complaints about predatory sales practices and service problems.

95. The Company stated in the July 2019 Prospectus that its "***dealer network is an integral component of our business strategy and serves as the means by which we are able to originate solar service agreements and related solar energy systems and energy storage systems in existing and prospective markets***." *Id.* at 22. The Prospectus also states, "***Our growth is dependent on our dealer network, and our failure to retain or replace existing dealers or to grow our dealer network could adversely impact our business. In addition, one of our dealers currently accounts for approximately half of our recently added customers***" *Id.* The Prospectus goes on the state that the "***dealer network is an integral component of our business strategy and serves as the means by which we are able to rapidly and successfully expand within existing and prospective markets***." *Id.* at 38.

96. On February 25, 2020, Sunnova filed its 2019 Form 10-K with the SEC, reporting the Company's financial and operational results for the quarter and year ended December 31, 2019. Sunnova stated its "***growth strategy depends on the continued origination of solar service agreements by us and our dealers***" and repeated, "Our growth is dependent on our dealer network and our failure to retain or replace existing dealers or to grow our dealer network could adversely

impact our business." *Id.* at 18, 20; *see also* 2020 10-K at 3, 25. In providing an overview of the Company, the 2019 10-K stated, in relevant part:

> We were founded to deliver customers a better energy service at a better price; and, through our solar and solar plus energy storage service offerings, we are disrupting the traditional energy landscape and the way the 21st century customer generates and consumes electricity.
>
> We have a differentiated residential solar dealer model in which we partner with local dealers who originate, design and install our customers' solar energy systems and energy storage systems on our behalf. ***Our focus on our dealer model enables us to leverage our dealers' specialized knowledge, connections and experience in local markets to drive customer origination while providing our dealers with access to high quality products at competitive prices and technical oversight and expertise.***

2019 10-K at 4.

97. That same day, Sunnova hosted an earnings call with investors and analysts to discuss the Company's Q4 2019 results (the "Q4 2019 Earnings Call"). During the scripted portion of the Q4 2019 Earnings Call, Defendant Berger stated, in relevant part:

> We closed out the year with another quarter of strong operational and financial results. 2019 was the year Sunnova became the industry leader in growth rate. ***Throughout the year, we increased our customer base, expanded our dealer network, lowered our cost of capital and boosted our storage attachment rates. As a result, we were able to meet, and in most cases, exceed our 2019 guidance targets***.
>
> ***In Q4 2019 alone, we added 6,000 new customers, which is a 20% increase from what was added just last quarter and an 84% increase over the fourth quarter in 2018. For all of 2019, we grew our customer base at a rate of 30%.***
>
> ***We are excited about the year ahead as we continue to acquire customers at a pace that is only continuing to quicken.*** Due to this increasing growth rate, later in the call, we will update the 2020 guidance ranges we discussed on our third quarter 2019 earnings call.

98. The February 2020 statements (repeated during the Class Period in the July 2020 Prospectus and on the Q4 Earnings Call on February 25, 2021, as stated by CEO Berger: "This exceptional growth is fueled by our 435 dealers and sub-dealers who continue to power our differentiated low cost model.") were false and misleading and omitted material facts that made them further false and misleading. While the statements attributed the Company's customer growth to its differentiated and unique dealer model and dealer network, they omitted that this dealer network and growth was dependent on approving dealers without sufficient oversight, approving installations that did not meet Sunnova's engineering requirements, and relying on dealers' salespeople who were engaged in predatory sales practices that created growth figures. The statements also omitted the hundreds of customer complaints that created regulatory risk for Sunnova and its investors.

99. Indeed, while ignoring the widespread nature of its predatory sales and services problems and speaking of the "inevitability" of complaints, Sunnova doubled down by assuring investors about its ethical practices and commitments to appropriate sales and service practices.

100. On May 14, 2020, Sunnova issued a press release announcing the Company's Q1 2020 financial results. The press release stated, in relevant part:

> "As a leading residential solar and storage provider in the United States, Sunnova has a deep commitment to providing best-in-class energy service to our customers, in good times and in bad. As the world learns how to navigate the many challenges brought on by the COVID-19 pandemic, we realize that the work we do has become more essential than ever before," said [Defendant] Berger[.] "Despite these challenges, as a designated essential service provider, ***we responded quickly and decisively in the early days of COVID-19 to ensure not only the health and safety of our customers, dealers, and employees, but to also ensure our customers continued to receive the highest level of service***.[”]

101. On May 15, 2020, Sunnova hosted an earnings call with investors and analysts to discuss the Company's Q1 2020 results (the "Q1 2020 Earnings Call"). During the scripted portion of the Q1 2020 Earnings Call, Defendant Berger stated, in relevant part:

> While I cannot promise what the future will hold, I do know that Sunnova will continue to be ***a leader to our customers, our dealers, our lenders, our shareholders, and the communities we serve***. And thanks to the ample amount of liquidity we have secured, and the strength and flexibility of our business model, we are better positioned than anyone in the industry to not only get through this current crisis, but to navigate any additional challenges these uncertain times may bring.

102. During the earnings call, Sunnova CEO and Defendant Berger repeatedly attributed the Company growth to its growing dealer network. At the same time, the Company claimed that this was possible, even though:

> ***We have a very stringent process of bringing dealers on board*** . . . . ***And so, what we demonstrated through this is that this combination of having these strong entrepreneurs in the field where they've grown up, they know everybody in that area, they have the ability to move quickly and do the right things, whether that is adjusting personnel, whether that's adjusting processes, whether it's sales or in service, installation and service, whatever it may be in conjunction with we're focused on our cost structure. We're focused on taking care of our customers, taking care of both in the truck rolls and the service, but also in the billing and the collections and everything that goes in with service, the capitalization.***

103. Nowhere are the pervasive complaints about the predatory sales practices and poor service by Sunnova and its dealers mentioned. As another example of unequivocally lauding the dealer network, in a July 30, 2020 earnings call, CEO Berger stated that the Company's growth and success "was made possible by 227 dealers and sub-dealers who comprise our differentiated, low-cost model," including the addition of "72 dealers and sub-dealers in the first half of 2020." No sales nor service problems, or risks related to the dealers, are discussed at all.

104. On October 28, 2020, Sunnova issued a press release announcing the Company's Q3 2020 results. The press release quoted Defendant Berger stating, in relevant part:

> As weather driven instability of regional power grids becomes increasingly intolerable for consumers and the integration of new technologies behind the meter grows, energy service providers like Sunnova will become even more attractive to homeowners. Driven by these rapid changes in technology, and a growing consumer appetite for cleaner, more reliable, and less expensive energy, Sunnova is well positioned to become the leading wireless power provider that consumers choose to power their energy independence.

105. In the following October 29, 2020 investor call, CEO Berger again stated that a principal way the Company was growing is through "***adding dealers and sub-dealers, which we see strong traction in and picking up*** . . . ." Then, in response to a request from an analyst about the dealer network and growth, CEO Berger stated regarding the new dealers being added, "***And we've got pretty strict protocols. It's hard to become a dealer at Sunnova, but I think that's necessary and certainly gives all of our stakeholders, especially our customers, a lot of comfort***."

106. On February 24, 2021, Sunnova issued a press release announcing the Company's Q4 and full year 2020 results. The press release quoted Defendant Berger, stating, in relevant part, "***Sunnova is well positioned to navigate the current market environment and to lead a decarbonized and decentralized energy transition while providing our customers with a better energy service at a better price***."

107. On February 25, 2021, Sunnova filed its 2020 10-K with the SEC, reporting the Company's financial and operational results for the quarter and year ended December 31, 2020. The 2020 10-K contained substantively similar descriptions of the Company's business and customer agreements.

108. On April 12, 2021, Sunnova published its 2020 Environmental, Social, and Governance Report (the "2020 ESG Report"). With respect to strategy, the 2020 ESG Report stated, in relevant part:

> At Sunnova, we believe that sustainability is the foundation of a strong business and a better tomorrow. ***We seek to inspire positive social change and foster a culture of integrity, performance, and ethical business practices***. Beyond the impact of our core business, we focus our attention on areas where we believe we can make the biggest positive environmental impact. We are working to reduce the impact of our operations in order to reduce our carbon footprint and improve efficiency.

109. Further, with respect to corporate governance, the 2020 ESG Report stated, in relevant part:

> ***At Sunnova, we are committed to leading with integrity, fostering a culture of honesty, maximizing performance, and embracing ethical business practices***.
>
> Because ESG is a top priority, we formalized its oversight at the Board level through our Nominating and Governance Committee in October 2020. The Committee is responsible for overseeing our ESG approach, strategy, and performance, and has adopted these responsibilities as outlined in our Committee Charter. ***We conduct our business in a responsible manner with oversight by our Board of Directors and executive management in compliance with our ethics and compliance policies and programs***.
>
> * * *
>
> Our Code of Conduct describes the entrepreneurial spirit on which Sunnova was built and the high standards by which we conduct business. These standards reflect our core values and drive us to achieve our mission. ***We expect all of our business partners, including our Dealers and Vendors, to follow the laws and regulations where they operate and to share our commitment to ethics, sustainability, environmental stewardship, health and safety, human rights, and labor issues. We conduct our business in a responsible manner with oversight by our Board of Directors and executive management in compliance with our ethics and compliance policies and programs***.

110. The Company also continued to laud its business model and dealer network, which it relied on for rapid growth, while ignoring the risks to investors created by its predatory sales practices and poor customer service.

111. On April 28, 2021, Sunnova issued a press release announcing the Company's Q1 2021 financial results. The press release stated, in relevant part:

> "Sunnova's strong first quarter results and continued rapid growth reiterates the power of our business model and capitalization strategy," said [Defendant] Berger[.] "***Our rapid growth has been made possible through the value of the Sunnova Network, whereby software and services enable aggregation capabilities to create additional value for our customers, dealers and equipment partners***.["]

112. On April 29, 2021, Sunnova hosted an earnings call with investors and analysts to discuss the Company's Q1 2021 results (the "Q1 2021 Earnings Call"). During the scripted portion of the Q1 2021 Earnings Call, Defendant Berger stated, in relevant part:

> ***We are also committed to upholding strong corporate governance practices and conducting business the right way as our core values of service, synergy, and sustainability underpin our corporate culture***. We look forward to continuing our work on ESG and will continue to communicate our progress over time.

113. On July 29, 2021, Sunnova hosted an earnings call with investors and analysts to discuss the Company's Q2 2021 results (the "Q2 2021 Earnings Call"). During the scripted portion of the Q2 2021 Earnings Call, Defendant Berger stated, in relevant part:

> ***Our dedicated field service technicians and customer care team are increasingly providing higher quality service at a quicker pace to our growing customer base***. The Sunnova-employed service team is focused on delivering unparalleled energy service quickly, accurately, and predicatively as new technologies such as batteries, load managers, electric vehicle chargers, and secondary generation enter the market. Service is becoming the crucial differentiator in the residential energy industry and Sunnova continues to position itself as the industry leader for service.

114. On October 27, 2021, Sunnova issued a press release announcing the Company's Q3 2021 financial results. The press release stated, in relevant part:

> "At Sunnova, we are committed to providing an unparalleled energy experience to our customers. We see brand and service as the critical differentiators in our industry and we are continuing to develop our technological, operational, and logistical capabilities to improve the quality and response time of the energy service we provide. As more equipment manufacturers enter our rapidly growing industry and broaden their equipment offerings, ***it has become clear that consumers require a service provider who integrates all of the capabilities and technological advancements into a simple, seamless, and integrated energy system that is backed up with quick and efficient service - and that is who Sunnova is***. Our vision is to be a wireless power provider and it is our goal to electrify the home for our customers so that they have the freedom to live life uninterrupted."

115. On October 28, 2021, Sunnova hosted an earnings call with investors and analysts to discuss the Company's Q3 2021 results (the "Q3 2021 Earnings Call"). During the scripted portion of the Q3 2021 Earnings Call, when discussing the Company's "***unique and unparalleled service commitment to customers***," Defendant Berger stated, in relevant part:

> Launching first in select key markets, ***we have established a goal well beyond that of any other residential energy service provider: to provide service within 72 hours for our solar-only customers and within 24 hours for our solar plus storage customers. This responsiveness, when combined with the resilience of our storage product offering, amounts to a superior energy experience for customers who are frustrated with the increasing cost and decreasing reliability they experience with a monopoly power provider.***
>
> ***We will accomplish this goal by accelerating the build-out of our software platform, continuing to build up our highly experienced and professionally managed service team, and continuously improve our logistics capabilities. This unprecedented service commitment will allow us to provide our customers with the power to live life uninterrupted.*** In time, it is our goal for the Sunnova name to be synonymous with the best energy service in the world.

116. On February 23, 2022, Sunnova issued a press release announcing the Company's Q4 and full year 2021 financial results. The press release stated, in relevant part:

> "In 2021, we saw the resiliency of our people, our dealers, our business model, and capitalization strategy help Sunnova navigate economic and regulatory uncertainties. As centralized utilities continue to rapidly increase their rates, ***Sunnova is able to provide its customers even greater savings through an energy service that is more reliable, more resilient, and more environmentally sustainable***."

117. On February 24, 2022, Sunnova its 2021 Form 10-K with the SEC, reporting the Company's financial and operational results for the quarter and year ended December 31, 2021. The 2021 10-K contained substantively similar descriptions of the Company's business and customer agreements.

118. On April 12, 2022, Sunnova published its 2021 Environmental, Social and Governance Report (the "2021 ESG Report"). With respect to corporate governance, the 2021 ESG Report repeated what it had said previously, in relevant part:

> ***At Sunnova, we are committed to leading with integrity, fostering a culture of honesty, maximizing performance and embracing ethical business practices.***
>
> This year, with oversight from the Nominating, Corporate Governance and Sustainability Committee, we made great strides in refining our ESG approach, strategy and performance as outlined in our Committee Charter. ***We conduct our business in a responsible manner with oversight by our Board of Directors and executive management in compliance with our ethics and compliance policies and programs.***
>
> * * *
>
> We seek to empower Sunnova employees to be champions of ESG within their roles and responsibilities. Our vision is to embed ESG throughout the organization through continuous education and engagement.

119. On October 26, 2022, Sunnova issued a press release announcing the Company's Q3 2022 financial results. The press release stated, in relevant part:

> "In the third quarter, we took action to fortify our liquidity and satisfy our planned 2023 corporate capital needs ahead of schedule through a timely capital raise, putting the company in an excellent financial position with a strong balance sheet," said [Defendant] Berger[.] "***Our record low customer default and delinquency rates and customer feedback clearly show that consumers do not see us as merely providing financing but providing an essential service to them***. Sunnova is optimally positioned to benefit from this strong consumer demand for its energy service, catalyzed by a combination of our focus on service, the Inflation Reduction Act, and the global energy crisis, as homeowners look to avoid rising utility bills that they must pay.[”]

120. Defendants' statements in ¶¶ 104-119, *supra*, were materially false and misleading, and they omitted material facts that made them further false and misleading. In these statements, the Company also continued to laud its business model and dealer network, which it relied on for rapid growth, while ignoring the risks to investors created by its predatory sales practices and poor customer service. Indeed, while ignoring the widespread nature of its predatory sales practices and services problems and speaking of the "inevitability" of complaints, Sunnova doubled-down by assuring investors about its ethical practices and commitments to appropriate sales and service practices. For example, on May 14, 2020, Sunnova claimed to be "ensur[ing] our customers continue to receive the highest level of service," which is completely at odds with the service complaints filed and the findings the authorities in Puerto Rico and the BBB. In the 2020 ESG Report, Sunnova similarly stated, "We seek to inspire positive social change and foster a culture of integrity, performance, and ethical business practices"; "we are committed to leading with integrity, fostering a culture of honesty, maximizing performance, and embracing ethical business practices"; and "We conduct our business in a responsible manner with oversight by our Board of Directors and executive management in compliance with our ethics and compliance policies and

programs." They went on to state, "We expect all of our business partners, including our Dealers and Vendors, to follow the laws and regulations where they operate and to share our commitment to ethics, sustainability, environmental stewardship, health and safety, human rights, and labor issues. We conduct our business in a responsible manner with oversight by our Board of Directors and executive management in compliance with our ethics and compliance policies and programs." These statements were demonstrably false, which was known to the Company and its highest-level executives, including CEO Berger and CFO Lane. Similarly false and misleading by Defendant Berger was the statement, "We are also committed to upholding strong corporate governance practices and conducting business the right way as our core values of service, synergy, and sustainability underpin our corporate culture" and "Our dedicated field service technicians and customer care team are increasingly providing higher quality service at a quicker pace to our growing customer base." He also remarkably said, on October 28, 2021, that Sunnova provided "unique and unparalleled service commitment to customers." That statement was demonstrably at odds with the service problems CEO Berger knew the Company had, as well as the numerous complaints they had received about the same, leading, for example, to lack of BBB accreditation. Those materially false and misleading statements continued with the 2021 ESG Report, for example, which said, "We conduct our business in a responsible manner with oversight by our Board of Directors and executive management in compliance with our ethics and compliance policies and programs."

121. On November 17, 2022, Sunnova hosted an analyst day for investors in Houston (the "2022 Analyst Day"). During that analyst day, which began in the morning on the 17th, Defendants made numerous false and/or misleading statements about the Company's customer

service, cost per customer, and purported positive reviews that the Company enjoyed on various rating services.

122. For instance, Defendant Berger stated, with respect to customer service, that "We're doing well. Customer satisfaction is over a 4.5 out of 5. Google star is 4.1. This is all wonderful. This is great. We do well." *See also* Section IV.D, *supra*.

123. The statement in ¶ 122, *supra*, was materially misleading in light of the countless negative reviews regarding customer satisfaction that had been made to the BBB, beginning in 2022, many of which the Company had responded to, thus rendering such statements knowingly false when made.

124. Also at the 2022 Analyst Day, Defendant Lane stated, "So we set a goal that we talked about in 2019 that we expected to get as much as 35% reduction in OpEx per customer. By the time we got to 2022, we're on track, right. So we think we're going to get, if not 35%, very close to 35%. But it's a continual process. And we continue to see that ***our cost per customer is declining***. And when I say our cost per customer, I'm talking about ***all our cost[s]***. Not just the cost to service the customer, but ***all the G&A*** and the sales and everything else that goes around that. Again, ***because of the efficiencies*** that Chris is creating for the whole company."

125. Lane's depiction was both false and misleading. It was false because "all costs" were not declining—G&A was increasing, in part because the Company had to hire people to remediate widespread customer service issues facing Sunnova. Lane's depiction was also misleading because it was not "efficiencies" that had been keeping costs lower than where they would have been otherwise—it was because the Company was inadequately serving its customers, which only temporarily decreased operating costs, and in turn meant that the Company had a looming operational expense reckoning building from the massive swell of customer complaints.

126. Lane concluded his comments at the 2022 Analyst Day by touting the Company's purported "reliability," "strong balance sheet," and belief that the Company's stock price was "undervalued":

> We have a strong balance sheet, very strong liquidity. We don't need to be going into the market seeking more liquidity right now, well over $1 billion of liquidity at the end of the quarter, and we just did another ABS to help reload some of that liquidity as well. We established positive OCF. We proved that yes, if you were to just take the operating assets and shut down the rest of the company, the company, Sunnova, makes money. And that will only grow, by the way, as we hit flips on our tax equity and as we go past the anticipated repayment dates of our securitizations. And we've also outlined that yes, we believe that there is a path to achieving GAAP-positive earnings and GAAP-positive operating cash flow.
>
> So, we keep talking about we think our company is undervalued. Everybody is going to talk about that. We realize that the financials can be confusing. But at the end of the day, we think the biggest disconnect is that folks don't realize we are a service company. We have a long-term contract and a long-term relationship with the customer. We sell energy independence, reliability, affordability, sustainability, peace of mind, and a promise to be there for our customers.

127. Defendants' statements in ¶¶ 124-126, *supra*, were materially false and/or misleading, and/or omitted material facts, because (a) the Company was not reliable when it came to customer service and (b) the swelling pool of customers who demanded that their solar installations be serviced created a looming operating expense reckoning. That looming operating expense reckoning, coupled with undisclosed regulatory risk created by failing to provide adequate customer service, rendered CFO Lane's statements about Sunnova's balance sheet false: Sunnova's balance sheet was not strong, but vulnerable to the material undisclosed regulatory risk and looming operating expense reckoning.

### C. Pressure to Obtain Government Backing for Project Hestia Leads to Further Material Misrepresentations

128. In a press release dated April 20, 2023, Sunnova announced a conditional commitment by the DOE LPO to provide an up-to-$3.0 billion partial loan guarantee, which the

Company said equated to a 90% guarantee of up to $3.3 billion of financing to support loans originated by Sunnova under a new solar loan channel named "Project Hestia."[12] Sunnova stated that Project Hestia would provide disadvantaged individuals and communities with increased access to Sunnova services by indirectly and partially guaranteeing the cash flows associated with those consumers' loans:

> To be eligible, each energy system must be outfitted with Sunnova's purpose-built technology, accessible by smart phone or other personal electronic device. The technology is designed to improve customer insights regarding their power usage and will facilitate demand response behavior. Sunnova believes this approach is expected to expand access to Sunnova's EaaS offerings, lay the foundation for future virtual power plant (VPP) activities, decrease greenhouse gas emissions, and increase the demand response impact of residential power systems.

129. Sunnova CEO and Defendant Berger stated that "Project Hestia would make possible a historic private sector investment in disadvantaged American communities and energy infrastructure."[13] "The DOE financing would accelerate the adoption of solar and storage, decrease greenhouse gas emissions, and expand the availability of reliable, clean, and affordable energy to those communities who benefit the most from low-cost energy."[14]

130. The DOE's Loan Program Office has a rigorous application process that requires companies to demonstrate their financial health, technological viability, and ability to responsibly

---

[12] *See* "Sunnova Announces $3 Billion U.S. Department of Energy Conditional Commitment to Expand Clean Energy Access and Lay Foundation for Virtual Power Plant Capabilities," Business Wire (April 20, 2023), https://www.businesswire.com/news/home/20230420005077/en/Sunnova-Announces-3-Billion-U.S.-Department-of-Energy-Conditional-Commitment-to-Expand-Clean-Energy-Access-and-Lay-Foundation-for-Virtual-Power-Plant-Capabilities (last accessed June 28, 2024).

[13] *Id.*

[14] *Id.*

manage government-backed projects.[15] That was particularly important for the Project Hestia partial loan guarantee, since Sunnova stated that its goal was to provide expanding low cost and alternative energy to disadvantaged and often marginalized communities, thus providing strong motive for Defendants to misrepresent the scale of Sunnova's customer base, as well as Sunnova's ability to service its customers.

131. But Sunnova, aware that its history of predatory sales practices and customer service failures would jeopardize its chances of obtaining the loan guarantee, did not disclose in its public filings its widespread misconduct during the application process. And as stated above, it affirmatively misrepresented itself as a trustworthy and socially responsible provider of clean energy access to underserved communities. Those misrepresentations continued after the April 20, 2023 press release about Project Hestia.

132. On April 26, 2023, Sunnova issued a press release announcing the Company's Q1 2023 financial results. The press release stated, in relevant part:

> "Our strong growth trajectory can be attributed to our continuous investments in software, service, and multiple channels for growth, which have allowed Sunnova to increase market share and widen its total addressable market. ***Just last week, we announced a conditional commitment with the [LPO] to expand access to Sunnova's Energy as a Service offerings***, ***potentially adding to our growth by making our energy services accessible to homeowners who may not have qualified without this commitment. We are dedicated to delivering the highest quality service to our customers and to our communities***."

133. On April 27, 2023, Sunnova hosted an earnings call with investors and analysts to discuss the Company's Q1 2023 results (the "Q1 2023 Earnings Call"). During the scripted portion of the Q1 2023 Earnings Call, Defendant Berger stated, in relevant part:

[15] *See* "Application Process," Loan Programs Office, Energy.gov, https://www.energy.gov/lpo/application-process (last accessed June 28, 2024).

> The robust demand for our energy services, as described on our previous earnings calls, has persisted throughout the balance of the first quarter and into the month of April. This strong demand can be attributed to our ability to offer customers more affordable energy, higher reliability, and ***exceptional customer service*** relative to the centralized power monopolies. Our commitment to providing a superior energy service sets us apart as industry leaders.
>
> ***We provide responsive and reliable service to our valued customers***, utilizing cutting-edge technologies to efficiently manage energy supply and demand through our Sunnova software platform, which powers our seamless Sunnova Adaptive Home, Sunnova Adaptive Business, and Sunnova Adaptive Community service experiences.

134. On May 1, 2023, Sunnova published its 2022 Sustainability Report. With respect to the Company's sustainability strategy, the 2022 Sustainability Report stated, in relevant part:

> In keeping with our values of Service, Synergy, and Sustainability, we are committed to continually improving our management of sustainability matters and their impact on our business. Our sustainability strategy serves to complement our corporate objectives, mitigate risks to the business and maximize our impact for our customers, employees, investors, communities, and other stakeholders. We frequently evaluate sustainability risks and opportunities through processes that include materiality assessments, annual risk management evaluations, and regular engagement with stakeholders to ensure we meet their needs.

135. Further, with respect to the Company's customer service, the 2022 Sustainability Report stated, in relevant part:

> As a leading Energy as a Service (EaaS) provider, we are providing a less expensive, more reliable, and cleaner energy service experience to our customers, ultimately, transforming the way people power their homes and businesses. With our energy services, our customers are achieving greater energy independence, resilience, and cost savings while reducing their environmental footprint.
>
> ***It is our unwavering commitment to providing exceptional customer service that helps sets us apart in our industry***.

136. Finally, with respect to corporate governance, the 2022 Sustainability Report stated, in relevant part:

> ***At Sunnova, we are committed to leading with integrity, fostering a culture of honesty, maximizing performance, and embracing ethical business practices***.
>
> As a responsible and sustainable business, we believe that good governance is essential to achieving our long-term goals and creating value for our stakeholders. We are committed to maintaining a high standard of corporate governance, which includes oversight of sustainability issues. Our approach to governance involves a commitment to transparency, accountability, and continuous improvement. We understand that good governance is not just a matter of compliance, but it is also a way of building trust and maintaining strong relationships with our stakeholders.

137. On July 26, 2023, Sunnova issued a press release announcing the Company's Q2 2023 financial results. The press release stated, in relevant part:

> "Our leading Energy as a Service business model, which is supported by three fundamental pillars - scale, service, and the retention of long-term contracted cash flows - has firmly established us as an industry leader quarter over quarter," said Defendant Berger[.] "We are rapidly achieving scale as evidenced by another record number of customers placed into service in the second quarter. ***This impressive customer growth is a testament to our commitment to providing exceptional service and meeting the needs of our expanding customer base***. ***As a result, we are once again increasing our customer additions guidance by 10,000 customers at the midpoint***. We are already in the customer contracting phase for 2024, and, given our strong growth momentum, we are projecting 40% customer growth over 2023.
>
> "***We are committed to providing exceptional and timely service***. We expect our 24-hour service guarantee, currently in four markets and growing to seven by year-end, to reach 70% of our customer base. This unparalleled focus on service further solidifies our position as the industry leader in Energy as a Service, and allows our customers to gain access to reliable, affordable, and sustainable energy solutions.[”]

138. Defendants' statements made on April 20, 2023, April 26, 2023, April 27, 2023, May 1, 2023, and July 26, 2023, were materially false and misleading, and they omitted material

facts that made them further false and misleading. As discussed, Sunnova continued to affirmatively misrepresent itself as a trustworthy and socially responsible provider of clean energy access to underserved communities and failed to disclose its widespread misconduct. Given Defendants' knowledge of the Company's ongoing problems with service delivery and the rampant complaints, these statements were also materially false and misleading. Moreover, by not disclosing these facts, Defendants knew any commitment with the DOE for funding would be in jeopardy.

139. On July 26, 2023, after the close of market, the Company reported financial results for the quarter ending June 30, 2023 ("Q2 2023"). The following morning, before the market opened, the Company held a conference call with investors on July 27, 2023. During the July 27, 2023 earnings call discussing Q2 2023 results, Berger touted Sunnova's purported "unwavering commitment to delivering responsive and reliable service":

> Sunnova achieved record growth in customer additions in the second quarter. This outstanding performance can be attributed to the strong demand for our comprehensive suite of services, the continued growth of our dealer base and the expansion of our addressable market and market share. ***What sets Sunnova apart and fuels our growth is our unique business model, exemplified by an unwavering commitment to delivering responsive and reliable service***.

140. Berger's emphasized statement above was materially false and/or misleading for touting Sunnova's purported commitment to "unwavering" and reliable customer service, and was knowingly false when made, as evidenced by Sunnova's response to widespread BBB complaints, of which the market was unaware.

141. Sunnova's deceptive efforts succeeded in the short term. On September 28, 2023, Sunnova issued a press release announcing that the Company had entered into the LPO Loan. The press release stated, in relevant part:

> "Today marks the beginning of an exciting chapter in our pursuit of a cleaner and more equitable energy landscape. With our collaboration with the [DOE], we are embarking on a journey that expands clean energy access and delivers economic benefit to Americans in disadvantaged communities," said [Defendant] Berger[.] "This partnership reflects our commitment to innovation with purpose."

142. On October 19, 2023, Sunnova issued a press release entitled "Sunnova Prices First Project Hestia Securitization of Residential Solar and Battery Systems." The press release stated, in relevant part:

> Sunnova . . . today announced the pricing of its Hestia I securitization, which indirectly benefits from [the LPO Loan].
>
> "Project Hestia stands as a testament to Sunnova and the DOE's unwavering commitment to spearheading transformative initiatives ***that benefit customers, empower communities, and enhance the overall energy landscape in the United States***," said [Defendant] Berger[.] "***This successful pricing of Project Hestia's first securitization showcases our continuing dedication to pioneering sustainable, reliable, and cost-effective energy solutions***."

143. Defendants' material misrepresentations and omissions were key to obtaining the DOE commitment without fallout, allowing Sunnova to secure the massive financial benefits of the partial loan guarantee, which included government backing that significantly lowered its borrowing costs for Project Hestia. The LPO stated in its September 2023 announcement that this was "the single largest commitment ever made by the Federal Government to solar power and DOE's first loan guarantee for a VPP. This project underscores the Biden-Harris Administration's efforts to support solar deployment across the nation so that all communities can enjoy the benefits that come with deploying renewable energy, such as lower utility bills, increased energy resilience, and healthier communities."[16] The LPO also stated that "Project Hestia will provide loans for clean

---

[16] "DOE Announces $3 Billion Partial Loan Guarantee to Sunnova's Project Hestia," Loan Programs Office, Energy.gov (Sept. 28, 2023), https://www.energy.gov/lpo/articles/doe-

energy systems for approximately 75,000 to 115,000 homeowners throughout the United States, ***including Puerto Rico*****—**benefiting disadvantaged communities facing high energy burdens that would otherwise have difficulty accessing clean energy." That was particularly ironic, given the overwhelming number of complaints made against Sunnova by Puerto Rican consumers and the investigation and findings of misconduct by the PREB. *See supra*, Section IV.C.

144. The loan guarantee also provided a major reputational boost for Sunnova, giving it the imprimatur of a trusted government partner and innovator in clean energy equity. This helped further the Company's growth narrative and stock promotion. These ill-gotten benefits crystallized when the loan guarantee closed in September 2023, but were put at risk when Sunnova's misconduct was exposed just two months later, prompting congressional scrutiny.

## VI. THE TRUTH BEGINS TO EMERGE

145. Despite the problems Sunnova had with predatory sales practices and service deficiencies, the resulting overwhelming number of consumer complaints leading to some attempts to address these issues, and Defendants' knowingly false and misleading statements and omissions about the same, which led it part to the partial loan guarantee for Project Hestia, it was not until November 2023 that the truth began to emerge to the public and investors.

146. On November 22, 2023, The Washington Free Beacon, a political non-investor website, put an article on its website an article entitled "Biden Admin Gave $3 Billion Loan to Solar Company Accused of Scamming Elderly."[17] In the article, the author stated the results of her

announces-3-billion-partial-loan-guarantee-sunnovas-project-hestia (last accessed June 28, 2024).

[17] Alana Goodman, "Biden Admin Gave $3 Billion Loan to Solar Company Accused of Scamming Elderly," The Washington Free Beacon (Nov. 22, 2023), https://freebeacon.com/energy/biden-admin-gave-3-billion-loan-to-solar-company-accused-of-scamming-elderly/ (last accessed June 28, 2024).

investigation, relying in part on interviews with consumer victims and numerous complaints made to the Texas Attorney General's office about Sunnova's business practices. Based on this investigation, the article states that the Company, which "was awarded a $3 billion Department of Energy loan[,] has been accused of scamming dementia patients on their deathbeds into signing five-figure, multi-decade solar panel leases . . . ."

147. As an example, one victim, Terry Blythe, a Texas resident, "told the *Washington Free Beacon* that her father was 86 years old and had been diagnosed with dementia when a door-to-door Sunnova salesman persuaded him to sign a 25-year solar panel lease in 2020. When her father passed away earlier this year, Blythe said she was left to grapple with the $34,000 contract."

148. The article went on to explain that "Blythe's is one of over 50 consumer complaints that have been filed against Sunnova with the Texas attorney general's office since last year, for issues ranging from maintenance delays to allegedly predatory sales tactics."

149. The November 22, 2023 article by The Washington Free Beacon stated that "Sen. John Barrasso (R., Wyo.), the top Republican on the Senate Energy and Natural Resources Committee, and other lawmakers have been investigating potential conflicts of interest at the DOE's Loan Programs Office (LPO), including its funding to Sunnova." The article continued:

> Before LPO director Jigar Shah joined the Biden administration, he founded and led a trade association called Cleantech Leaders Roundtable, which shares a board member with Sunnova. Cleantech Leaders Roundtable has become a gatekeeper for companies seeking loans from Shah's office, cohosting paid events for its members with the LPO director, the Free Beacon reported in October.
>
> "The potential for conflicts of interest, especially in light of a $3 billion loan approval for Sunnova, a company who shares a board member with Cleantech Leaders Roundtable, cannot be overlooked," said Barrasso in a letter to DOE's ethics counsel Susan Beard this month.

150. Soon thereafter, in a letter dated December 7, 2023, and publicly disseminated in a press released on December 8, 2023, House Energy Committee Chair Rodgers and Senate Energy Committee ranking member Barrasso sent a letter to the DOE's LPO and its Director Mr. Jigar Shah seeking information related to Sunnova's LPO partial loan guarantee, which followed the release of the investigative reports regarding the Company's business practices.[18] This letter was widely publicized in the press, including on Fox News and Seeking Alpha. The letter stated, in relevant part:

> We write to you regarding disturbing reports about Sunnova Energy Corporation (Sunnova), a residential solar company, to which the Department of Energy's (DOE) Loan Programs Office (LPO) recently awarded a $3 billion partial loan guarantee.
>
> Billed as "the single largest commitment ever made by the Federal Government to solar power," LPO closed this partial loan guarantee to Sunnova's "Project Hestia" on September 28, 2023.[] According to LPO, this project will make distributed energy resources and virtual power plant software available to more Americans by providing loans to approximately 75,000 to 115,000 homeowners for clean energy systems.[] This project will focus on households in disadvantaged communities, aiming to provide at least 20 percent of loans to customers with FICO credit scores of 680 or less and up to 20 percent of loans to homeowners in Puerto Rico.
>
> We are alarmed about recent, credible reports that Sunnova has racked up numerous consumer complaints, including those alleging troubling sales practices, such as Sunnova pressing elderly homeowners in poor health to sign long-term contracts costing tens of thousands of dollars.[] These reports cite interviews with individuals who struggled to deal with large contracts that their elderly parents signed shortly before passing away as well as state consumer complaints alleging maintenance delays and predatory sales strategies.[] For example, one woman interviewed stated that a door-to-door Sunnova salesman sold her father-who she

[18] Letter dated December 7, 2023, from Cathy McMorris Rodgers, Chair of the House Energy Committee, and John Barrasso, M.D., Ranking Member of the Senate Energy Committee, available at https://d1dth6e84htgma.cloudfront.net/12_07_2023_Joint_Letter_to_DOE_LPO_c9ac40dc52.pdf (last accessed June 28, 2024).

> characterized as in hospice care-a $60,000 solar system for his mobile home shortly before his death.
>
> Additional reports suggest these troubling reports are not isolated incidents. For example, while Project Hestia will target Puerto Rican homeowners for 20 percent of its loans, its residents have previously experienced major problems with Sunnova's services there. By 2017, Puerto Rico's Independent Office of Consumer Protection reportedly received over 1,000 complaints regarding Sunnova systems that include claims of misleading consumers and failing to deliver lower energy bills as promised.[] In 2019, the Puerto Rican Energy Bureau also released a report confirming the validity of numerous consumer complaints it received. These included complaints of consumers accidentally signing up for 25-year contracts, consumers being misled about potential savings with solar panels, and Sunnova not fully revealing the costs of financing these solar panels to consumers.[] Residents in other parts of the country have also reported problems with Sunnova systems, including deceptive sales practices.[] These allegations are particularly troubling, as LPO has stated this program will focus on disadvantaged communities.

151. After these revelations, Sunnova's stock price fell $2.00 per share, or 16.12%, to close at $10.41 per share on December 8, 2023.

152. Several sources attribute the sharp decline in Sunnova's stock price to the revelations about its sales and services malfeasance, and the congressional inquiry about what had occurred. On December 8, 2023, *Seeking Alpha* published an article entitled, "Sunnova Energy sinks as Congress seek 'history of predatory sales practices.'"[19] The article attributed the decline in the Company's stock price to the letter by "House Energy and Commerce Committee Chair Cathy McMorris Rodgers and Senate Energy and Natural Resources Ranking Member John Barrasso [stating that] they are 'alarmed about recent, credible reports that Sunnova has racked up

[19] Carl Surran, "Sunnova Energy sinks as Congress seeks 'history of predatory sales practices,'" Seeking Alpha (Dec. 8, 2023), https://seekingalpha.com/news/4044820-sunnova-energy-sinks-as-congress-seeks-history-of-predatory-sales-practices (last accessed June 28, 2024).

numerous consumer complaints, including those alleging troubling sales practices,' such as pressuring elderly homeowners in poor health to sign long-term contracts costing tens of thousands of dollars." The article stated that the congressional letter "question[ed] a $3B partial loan to the company" by the Department of Energy LPO.

153. Financial analysts reached the same conclusion about the cause of the decline in Sunnova's stock price. A J.P. Morgan analyst report on Sunnova from December 11, 2023, stated that Sunnova's stock price on December 8, 2023, "traded down [approximately] 16% . . . on the news" that members of the House and Senate Energy Committees sent a letter to the DOE's Loan Programs Office stating that they are "alarmed by 'disturbing' consumer complaints against NOVA regarding its sales practices" and seeking documents related to the $3 billion loan partial loan guarantee granted to Sunnova.[20]

154. On January 25, 2024, Time published an article entitled, "The Rooftop Solar Industry Could Be on the Verge of Collapse."[21] The article pointed to the reports of widespread fraudulent and predatory sales practices in the industry and stated that Sunnova is "under the microscope for having received a $3 billion loan guarantee from the Department of Energy while facing numerous complaints about troubling sales practices that targeted low-income and elderly homeowners."

---

[20] On January 23, 2024, House Energy Committee Chair Rodgers, Subcommittee on Energy, Climate, and Grid Security Chair Jeff Duncan, and Subcommittee on Oversight and Investigations Chair H. Morgan Grifith sent a follow-up letter to LPO Director Shah about inadequate responses to previous inquiries, including about the "LPO's review and awareness of troubling business practices by Sunnova, a recent partial loan guarantee recipient." *See* Letter dated January 23, 2024, available at https://d1dth6e84htgma.cloudfront.net/01_23_2024_Letter_to_DOE_LPO_Director_Shah_re_Followup_1_e87bcf4946.pdf (last accessed June 28, 2024).

[21] Alana Semuels, "The Rooftop Solar Industry Could Be on the Verge of Collapse," Time (Jan. 25, 2024), https://time.com/6565415/rooftop-solar-industry-collapse/ (last accessed June 28, 2024).

155. Immediately after the reports that led to the stock decline, the December 11, 2023 J.P. Morgan report stated that in a call Sunnova CEO Berger agreed that "the company owns the customer experience and has accountability for its dealers." CEO Berger also admitted that the Company automatically generates a ticket for customer complaints, indicating Defendants' full knowledge of them.

156. Also, in a press release dated December 11, 2023, Sunnova attempted to defend itself. In so doing, it revealed previously undisclosed efforts it was taking to correct the problems in Puerto Rico, including (at the time of the announced DOE commitment), opening its first call center in Puerto Rico with Spanish-speaking operators to provide quicker customer support and dispatch immediate service requests to the island. Additionally, Sunnova doubled its service technician team in Puerto Rico and stated that Puerto Rico was Sunnova's first 24-hour service response time market.

157. However, despite these public-facing statements of confidence in the sales and services of the Company, according to FE 3, in a company-wide meeting FE 3 attended in spring 2024, during a discussion involving both CEO Berger and Executive Vice President and COO Mathews, they acknowledged the service issues and numerous BBB consumer complaints, and stated that Sunnova had been working hard to address the issues that led to those complaints and to resolve the complaints.

158. Moreover, as explained in Section IV, *supra*, during the Class Period, the Company acknowledged internally that there were problems with the Company's sales and service and that individuals had been hired to clean up the Company's act, and it appears, mitigate the Company's risk from engaging in these practices, which it had not done before the stock dropped precipitously on revelations of the fraud.

159. On February 21, 2024, after the close of the market, Sunnova reported its Fourth Quarter 2023 ("Q4 2023") financial results. Therein, the financial effects of Defendants' false and misleading statements were further revealed, particularly with respect to statements about Sunnova's operating costs: Sunnova's Q4 2023 earnings showed a $54.2 million increase in operating expenses, or "OpEx," compared to Q3 2023, which was the largest ever quarterly increase (on a sequential basis) for operating expenses for the Company. The large increase in operating expenses stemmed in part from efforts to remediate widespread customer service issues. Indeed, the Company's Operating Cost per Customer reached $1,025 in Q4 2023, which was the highest that metric had reached since Q1 2021, when the Company had far fewer customers and thus less operating leverage (meaning it made more intuitive sense for the cost per customer to be higher in Q1 2021). Corresponding with these increased costs revealed in Q4 2023, within the Company's Q4 2023 earnings presentation, the Company reported—for the first time since going public—certain material customer service metrics, including the percentage of customers "with an elevated concern," and this metric hit the lowest level visible on the Company's presentation (which dates back to Q1 2022). The clear inference is that a material portion of the increased operating costs went to address the widespread customer service issues that were brought to light by the congressional letter. And, in response to that letter, the Company finally addressed the looming customer service issues that had previously been building.

160. Indeed, the market quickly connected Sunnova's increased operating costs with improved customer service. For instance, during the Q4 2023 earnings call, held on February 23, 2023, before the market opened, Wall Street analyst Phillip Shen remarked "Shifting over to OpEx, ***it looks like the adjusted OpEx went up meaningfully in Q4***. Clearly, you're seeing the benefit of that in your customer service quality metrics." But Shen also remarked at Defendants' prior false

statements about operating costs being forecast to decline: "***You talked about lowering this by 20% per customer***."

161. Shen then asked, "Can you share, what the outlook is specifically for the customer service and sales and marketing line items, which were each quite high on an absolute dollar basis in Q4. Can you talk about how these line items may trend and scale ahead? Thanks."

162. In response, CEO Berger described the financial impact, including on operating costs, that remediating Sunnova's prior undisclosed customer services issues would have on Sunnova's financial statements:

> It feels, so some of this is and we've attempted to give more visibility by breaking out direct sales. And that is some of the -- a good portion of the sales increase. It's still a small minority of our origination, but it does stand out as far as the sales and marketing growth***. On the service side, I've talked over the last few quarters about catching up on the service levels that we have promised our customers. We've done that now and then some. And so we'll be able to, once we've cleared that backlog which we've done will be -- we're seeing a cost reduction on a per customer basis that's pretty meaningful. And so you'll see that as I said peak in Q4 outside***, some bonus payments, we paid bonuses to employees in Q1. We are already seeing some pretty meaningful cost reductions this quarter and last few months. I expect that to continue to accelerate in Q2 and beyond, but it's too high. There's no question about it and we're bringing it down meaningfully and slowing growth. Clearly, you can see that in the capital budgets we've laid out for '24, '25 and '26. That helps us to meaningfully cut costs as well and then bring in the automation. That's been something we've invested in as part of the spending, a big part of the spending and expect to start realizing some of those efficiencies are a lot of those efficiencies as soon as this quarter.

163. On the same Q4 2023 earnings call, Defendant Berger admitted that, with respect to the Sunnova dealer issues that, "There's been a couple of stumbles on some dealers. ***Quite candidly we saw those coming*** . . . ."

164. Finally, also during the Q&A portion of the Q4 2023 earnings call, the topic of the Congressional inquiry came up, wherein Berger admitted that the Company would be making changes to its customer service in response:

> **Pavel Molchanov**
> Thanks for taking the question at the risk of delving a bit into politics, so to speak. You obviously had the letter from the Congressional Committee about Hestia that was several months ago. Can we just get an update on that whole situation?
>
> **John Berger**
> Sure Pavel. Yes, most unfortunate, it's very clear politics are at play, but to be clear that that letter was directed at the Department of Energy and the Loan Program Office not us. Obviously, we're mentioned but we're not subject to any investigation at this point in time. And look, what I would say is, I'm just going to focus on having us do a better and better job of serving customers. There's always ways that we can improve our customer service. There's always ways that we can improve our quality control or consumer protection.
>
> ***We've got plans that we've put out -- put forth about how to improve consumer protection, mandating service***. I think the States and the Federal government audit mandate service with a creditworthy companies, service companies like ourselves. We've been calling for that for years. So, we're going to focus on doing a better, better job for our customer. And again, there's always something we can improve on and we're going to focus on doing that. And we're going to leave the noise, shall we say to two others to deal with.

165. On all this news, Sunnova's stock fell $2.81 per share, or 24.6% on massive volume (22.3 million shares) on February 22, 2024, to close at $8.57 per share. Sunnova's stock continued to decline the following day, by $1.13 per share, or 13.1%, to close at $7.44 per share on February 23, 2024, also on very heavy volume (20.9 million shares).

166. On April 3, 2024, the DOE Office of Inspector General responded to the congressional inquiry about the LPO's partial loan guarantees to Sunnova, which were provided despite the Company's purported problems with predatory sales practices and service problems. The Inspector General stated that it was evaluating the concerns raised about conflicts of interests

that led to the "Sunnova loan guarantee" as well as the process used by the LPO will use to approve loans and loan guarantees.[22]

167. On May 1, 2024, an article published by Bloomberg reported that the Company had engaged investment bank Moelis to advise the Company on options related to its balance sheet as the Company's convertible bonds traded at roughly 43 cents on the dollar and the Company "wrestles with upcoming debt maturities," thus revealing that contrary to CFO Lane's representations, Sunnova's balance sheet was not strong in light of the material undisclosed facts about Sunnova's widespread customer service issues.

168. Also on May 1, 2024, the Company announced financial results, along with the termination of CFO Lane. CEO Berger is quoted as stating that it was a "logical time" for a CFO transition, though no replacement was named at the time of Lane's departure.

169. On all this news, Sunnova shares fell $0.68 per share, or 16.1%, from $4.21 to $3.53 per share on May 1, 2024, on heavy trading volume.

170. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## A. Post-Class Period Developments

171. On May 28, 2024, Sunnova Board of Director member Rahman D'Argenio resigned from Sunnova's Board of Directors.

[22] April 3, 2024 Letter, available at https://www.energy.senate.gov/services/files/399E2CA2-8B4C-46C7-A97F-82CFE8EE23B6 (last accessed June 28, 2024).

## VII. LOSS CAUSATION

172. The artificial inflation created by Defendants' misrepresentations and omissions began to be removed from Sunnova's share price in direct response to information revealing or partially revealing the disclosures. These disclosures divulged some information that corrected Defendants' prior misrepresentations and omissions of material fact and/or disclosed facts Defendants misrepresented and omitted that were a substantial factor in causing investors' economic loss.

173. On December 7, 2023, Representative Rogers, Chair of the U.S. House Committee on Energy and Commerce, and Senator Barrasso, ranking member of the U.S. Senate Committee on Energy and Natural Resources, sent a letter to the DOE and Sunnova seeking information related to the LPO Loan and Project Hestia following the release of the "disturbing" reports regarding the Company in the November 22, 2023 article by The Washington Free Beacon.

174. Following these partial revelations, the price of Sunnova common stock declined. On December 8, 2023, Sunnova's stock price fell $2.00 per share, or 16.12%, to close at $10.41 per share on December 8, 2023. The timing and magnitude of the declines in Sunnova's share price negate any inference that Lead Plaintiffs' losses were caused by changed market conditions, macroeconomic or industry factors, or Company-specific factors unrelated to Defendants' wrongful conduct.

175. In addition, as explained in Section V.I, *supra*, analysts connected the disclosures to the drop in share price. For example, A J.P. Morgan analyst report on Sunnova from December 11, 2023, stated that Sunnova's stock price on December 8, 2023 "traded down [approximately] 16% . . . on the news" that members of the House and Senate Energy Committees sent a letter to the DOE's Loan Programs Office stating that they are "alarmed by 'disturbing' consumer

complaints against NOVA regarding its sales practices" and seeking documents related to the $3 billion loan partial loan guarantee granted to Sunnova.

176. The financial effects of Defendants' fraud would be further partially revealed on February 21, 2024, when the Company reported its Q4 2023 earnings, which showed a material and unexpected increase in operating expenses, or "OpEx," which stemmed in part from efforts to remediate widespread customer service issues. The next day before the market opened, the Company held an investor conference call. During the earnings call, Defendant Berger admitted that, with respect to the Sunnova dealer issues, "There's been a couple of stumbles on some dealers. Quite candidly we saw those coming . . . ."

177. On this news, Sunnova's stock fell $2.81 per share, or 24.6% on massive volume (22.3 million shares) on February 22, 2024, to close at $8.57 per share. Sunnova's stock continued to decline the following day, by $1.13 per share, or 13.1%, to close at $7.44 per share, also on very heavy volume (20.9 million shares).

178. On May 1, 2024, an article published by Bloomberg reported that the Company had engaged investment bank Moelis to advise the Company on strategic alternative related to its balance sheet as the Company's convertible bonds traded at roughly 43 cents on the dollar and the Company "wrestles with upcoming debt maturities."

179. Also on May 1, 2024, the Company announced financial results, along with the termination of CFO Lane. CEO Berger is quoted as stating that it was a "logical time" for a CFO transition, though no replacement was named at the time of Lane's departure.

180. On all this news, Sunnova shares fell $0.68 per share, or 16.1%, from $4.21 to $3.53 per share on May 1, 2024, on heavy trading volume.

181. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by Lead Plaintiffs and other Class members. Had Defendants disclosed complete, accurate, and truthful information concerning these matters during the Class Period, Lead Plaintiffs and other Class members would not have purchased or otherwise acquired Sunnova's securities or would not have purchased or otherwise acquired these securities at the artificially inflated prices that they paid. It was also foreseeable to Defendants that misrepresenting and concealing these material facts from the public would artificially inflate the price of Sunnova securities and the ultimate disclosure of this information, or the materialization of the risks concealed by Defendants' material misrepresentations and omissions would cause the price of Sunnova securities to decline.

## VIII. ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER

182. During the Class Period, Defendants had both the motive and opportunity to commit fraud. They also had actual knowledge of the misleading nature of the statements they made, or acted in reckless disregard of the true information known to them at the time. In so doing, Defendants participated in a scheme to defraud and committed acts, practices, and participated in a course of business that operated as a fraud or deceit on purchasers of the Company's securities during the Class Period.

### A. Defendants' Suspiciously Timed Sales Support Scienter

183. As a result of the above false and misleading statements, the Company's share price was artificially inflated. The Individual Defendants, while in possession of material, non-public information, capitalized on the artificially inflated stock price by selling significant portions of their holdings of Sunnova common stock during the Class Period.

184. Defendant Berger sold a total of 313,923 shares between August 2, 2021, and August 1, 2023, while the price of the Company's stock was artificially inflated, earning

approximately $8.6 million in proceeds, substantially more than what he would have earned had investors known the truth about Sunnova's business operations.

185. CEO Berger's Class Period sales were executed at prices ranging from $37.12 per share to $14.04 per share. His total shares sold of 313,923 were made at an average price of $27.63 per share, or more than 7.8x the closing price of $3.53 per share on the first day following the end of the Class Period. CEO Berger's Class Period sales are as follows:

| Date | **Number of Shares** | **Average Price Per Share** | **Proceeds** |
|---|---|---|---|
| 8/2/2021 | 47,432 | 37.12 | 1,760,676 |
| 3/14/2022 | 9,300 | 22.08 | 205,344 |
| 8/1/2022 | 49,656 | 24.67 | 1,225,014 |
| 8/8/2022 | 150,000 | 30.04 | 4,506,000 |
| 3/22/2023 | 10,385 | 14.04 | 145,805 |
| 8/1/2023 | 47,150 | 17.86 | 842,099 |

186. Similarly, Defendant Lane sold a total of 53,591 shares between August 2, 2021, and March 23, 2023, while the price of the Company's stock was artificially inflated, earning approximately $1.1 million in proceeds, substantially more than what he would have earned had investors known the truth about Sunnova's business operations.

187. Lane's weighted-average Class Period sale price of $22.04 is similarly more than 6.2x the $3.53 per share on the first day following the end of the Class Period. Lane's Class Period sales appear as follows:

| Date | **Number of Shares** | **Average Price Per Share** | **Proceeds** |
|---|---|---|---|
| 8/2/2021 | 8,300 | $37.12 | 308,137 |
| 3/14/2022 | 11,870 | $21.95 | 260,510 |
| 3/16/2022 | 4,051 | $23.39 | 94,753 |
| 3/23/2022 | 1,850 | $25.05 | 46,342 |
| 8/1/2023 | 8,690 | $24.60 | 213,774 |
| 3/22/2023 | 14,015 | $14.00 | 196,210 |
| 3/23/2023 | 4,815 | $13.51 | 65,050 |

188. The shares sold by the Individual Defendants during the Relevant Period were highly suspicious in both amount (based on the sheer dollar value of shares sold) and timing (made during a time period where Defendants were making materially false statements to investors and/or failing to disclose material information that they had a duty to disclose).

**B. Defendants' Access to Information Supports Scienter**

189. Throughout the Class Period, Defendants had access to information that their statements were false.

190. For example, during the November 17, 2022 analyst day that Sunnova hosted in Houston, Defendant Berger admitted, "***We're watching everything*** that's going on out there for our customers and our customer base, the fleet so to speak. That gives us ***the ability to constantly monitor*** what's happening out there."

191. Defendant Berger also stated during the November 17, 2022 analyst day that, "By the way, we're the only service firm out there that's upselling our current customers," thus suggesting awareness of the Company's sales practices and tactics.

192. At another point during the November 17, 2022 analyst day, Sunnova Executive Vice President and Chief Marketing Officer, Michael Grasso, introduced a Sunnova dealer, J.J. Gonzalez ("Gonzalez"), who is the President of Windmar Homes and a Sunnova "exclusive Platinum dealer in Puerto Rico." Gonzalez stated the following about Sunnova:

> And Sunnova has been the perfect partner to us and others during that. ***They get involved in all areas of our business***. They have the technology platform. Just to give some examples of the technology, ***the sales strategies***, installation practices, design, everything. Every single area or department of Windmar and we have over 1,000 employees right now, full-time, have been impacted and are in contact in some way or another with Sunnova's team.

193. Former Employee 5 ("FE 5") was a senior level marketing professional with Sunnova from early 2021 through 2024. FE 5 reported to an executive Vice President at Sunnova.

194. According to FE 5, Sunnova was highly focused on tracking customer reviews—both good and bad. FE 5 also stated that Sunnova's marketing department (where FE 5 worked) was responsible for tracking such reviews.

195. FE 5 was sometimes copied on emails that involved escalating complaints. According to FE 5, customer complaints that were not resolved could be escalated up to the chain to reach the "Office of the President," which was overseen by Paul Mathews, Sunnova's EVP Service and Supply Chain between 2023 and 2024, and later Sunnova's Chief Operating Officer beginning in February 2024.

196. FE 5 also stated that Paul Mathews was hired by Sunnova to address customer service, and that over the time of FE 5's employment, Sunnova's customer service department expanded from a few people to 500.

### C. Defendants' Core Operation—Focused on Customer Service—Supports Scienter

197. Customer service was a critical aspect and a core operation at Sunnova. During the November 17, 2022 analyst day, Sunnova Executive Vice President & Chief Information Officer, Chris Hayden ("Hayden"), stated that "service is ***critically important*** to Sunnova as a business. We really think of ourselves as a service company, Energy as a Service, effectively creating that holistic service experience." Indeed, during the November 17, 2022 analyst day, the word "service" was mentioned 144 times. By contrast, "earnings" was mentioned just eight times during the November 17, 2022 analyst day. "Critically important" was mentioned just twice—once in regard to service and once in regard to the customer having power during the day.

198. Hayden continued, "You heard us today talk a little bit about ***how important services***—well it's not a little bit—quite a bit about how important services [sic] is to us."

199. Defendant Berger similarly remarked on the importance of Sunnova's service:

> And when I founded the company 10 years ago, I set out to deliver a better energy service at a better price. It's a big vision to give consumers choice, control, security, control over rising prices and to change the way that energy is consumed and generated, and not just provide them financing, not just provide them panels on the roof or a product, a battery in the garage, but service. ***Service is the key.*** Service is how power has been delivered for over 100 years through the monopoly lines and services the way consumers consume power. It is not a product. It is not a collection of boxes. It is not a collection of financing contracts. ***It is a service. And Sunnova is a service business. If there is nothing else, not a single bit of information, not a single bit of understanding that you take away from this morning other than you walk out of here saying Sunnova is a service business, not a financing business.***

200. Defendant Lane also reiterated the importance of service during the November 17, 2022 analyst day, stating:

> And I think this is the big thing that when you're a service company, and John talked about this before, when you're a service company, people identify you as a service company. And while it's the big point we're trying to make today, when we're communicating to all of you all and those listening on the webcast that ***we are a service company***, the industry already knows us as a service company.

201. Lane also explained how being a service company ultimately flowed to Sunnova's bottom line: "So everything was already in there, but it's that service component that we think we're really going to start to monetize. So, all of the stuff, more leases and PPAs, more services per customer, yes, more gain on sale, is all going to be driving adjusted EBITDA."

202. Lane even concluded his November 17, 2022 remarks with the following about service:

> [A]t the end of the day, we think the biggest disconnect is that folks don't realize we are a service company. We have a long-term contract and a long-term relationship with the customer. We sell energy independence, reliability, affordability, sustainability, peace of mind, and a promise to be there for our customers.

203. As noted above, Defendants had a motive to issue its false and misleading statements as it needed cash to grow its dealer network and to finance the solar projects. For

example, the 2019 Prospectus and each 10-K through the 2023 10-K states: "***We need to obtain substantial additional financing arrangements to provide working capital and growth capital***" and "***If financing is not available to us on acceptable terms when needed, our ability to continue to grow our business would be materially adversely impacted.***" The 2023 10-K lists a long series of financing arrangements, including notes and securitizations and public offerings during the Class Period. *See* 2023 10-K at 81-87.

## IX. INAPPLICABILITY OF STATUTORY SAFE HARBOR

204. The statutory safe harbor or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements alleged herein.

205. None of the statements complained of herein was a forward-looking statement. Rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made.

206. To the extent that any materially false or misleading statement alleged herein, or any portion thereof, can be construed as forward-looking, such statement was a mixed statement of present and/or historical facts and future intent, and is not entitled to safe harbor protection with respect to the part of the statement that refers to the present and/or past.

207. To the extent that any of the materially false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. Given the then-existing facts contradicting Defendants' statements, as set forth above, any generalized risk disclosures made by Sunnova were insufficient to insulate Defendants from liability for their materially false and misleading statements.

208. To the extent that the statutory safe harbor doctrine does apply to any forward-looking statements pleaded herein, Defendants are liable for those false and/or misleading forward-looking statements because, at the time each of those statements was made, Defendants did not actually believe the statements, had no reasonable basis for the statements, or were aware of undisclosed facts tending to seriously undermine the statements' accuracy.

## X. THE PRESUMPTION OF RELIANCE

209. At all relevant times, the market for Sunnova's securities was efficient for the following reasons, among others:

(a) Sunnova's securities met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

(b) As a regulated issuer, Sunnova filed periodic reports with the SEC and the NYSE;

(c) Sunnova regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) Sunnova was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales force and certain customers. Each of these reports was publicly available and entered the public marketplace.

210. As a result of the foregoing, the market for Sunnova's securities reasonably promptly digested current information regarding Sunnova from all publicly available sources and reflected such information in the price of Sunnova's securities. All purchasers of Sunnova

securities during the Class Period suffered similar injury through their purchase of Sunnova securities at artificially inflated prices, and a presumption of reliance applies.

## XI. CLASS ACTION ALLEGATIONS

211. Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3) on behalf of a Class consisting of all those who purchased or otherwise acquired the securities of Sunnova between July 25, 2019, and May 1, 2024, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are (i) Defendants; (ii) members of the immediate family of each Individual Defendant; (iii) any person who was an officer or director of Sunnova; (iv) any firm or entity in which any Defendant has or had a controlling interest; (v) any person who participated in the wrongdoing alleged; (vi) Defendants' liability insurance carriers; (vii) any affiliates, parents, or subsidiaries of Sunnova; (viii) all Sunnova plans that are covered by ERISA; and (ix) the legal representatives, agents, affiliates, heirs, beneficiaries, successors-in-interest, or assigns of any excluded person or entity, in their respective capacity as such.

212. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Sunnova securities were actively traded on the NYSE. As of June 26, 2024, there were approximately 124 million shares of Sunnova common stock outstanding. While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are at least hundreds of thousands of members of the Class. Class members who purchased Sunnova securities may be identified from records maintained by Sunnova or its transfer agent(s) and may be notified of this class action using a form of notice similar to that customarily used in securities class actions.

213. Lead Plaintiffs' claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal laws as complained of herein.

214. Lead Plaintiffs will fairly and adequately protect Class members' interests and have retained competent counsel experienced in class actions and securities litigation.

215. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of fact and law common to the Class are whether:

(a) the federal securities laws were violated by Defendants' acts as alleged herein;

(b) Defendants made statements to the investing public during the Class Period that were false, misleading or omitted material facts;

(c) Defendants acted with scienter; and

(d) Class members suffered compensable damages.

216. A class action is superior to all other available methods for the fair and efficient adjudication of this action because joinder of all Class members is impracticable. Additionally, the damage suffered by some individual Class members may be relatively small so that the burden and expense of individual litigation make it impossible for such members to individually redress the wrong done to them. There will be no difficulty in the management of this action as a class action.

## XII. CLAIMS BROUGHT PURSUANT TO THE EXCHANGE ACT

### COUNT I

**(Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder Against All Defendants)**

217. Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

218. During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew were, or they deliberately disregarded as, misleading in that they contained misrepresentations and failed to disclose material facts necessary to make the statements made, considering the circumstances under which they were made, not misleading.

219. To the extent that the claims alleged herein are based upon the omission of information, such omissions were made in connection with the misrepresentations and misleading half-truths alleged herein and were not based upon pure omissions.

220. Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiffs and others similarly situated in connection with their purchases of Sunnova securities during the Class Period. A violation under any of the aforementioned subsections of Rule 10b-5 is sufficient to state a claim, and Lead Plaintiffs expressly allege violations under all three.

221. Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the U.S. mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiffs and the Class; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with a deliberately reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of Sunnova securities, which were intended to, and did: (a) deceive the

investing public, including Lead Plaintiffs and the Class; (b) artificially inflate and maintain the market price of Sunnova securities; and (c) cause Lead Plaintiffs and other members of the Class to purchase Sunnova securities at artificially inflated prices and suffer losses when the true facts became known.

222. Defendant Sunnova is liable for all materially false and misleading statements made during the Class Period, as alleged above. Defendants Berger and Lane, as top executive officers of the Company during their respective tenures, are liable as direct participants in the wrongs complained of herein. Defendants Berger and Lane are liable for the false and misleading statements they personally made and/or signed, as alleged above.

223. As described above, Defendants acted with scienter throughout the Class Period, in that they acted either with intent to deceive, manipulate, or defraud, or with deliberate recklessness. The misrepresentations and omissions of material facts set forth herein, which presented a danger of misleading buyers or sellers of Sunnova securities, were either known to the Defendants or were so obvious that the Defendants should have been aware of them.

224. Lead Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Sunnova securities, which inflation was removed from the price of the Company's securities when the true facts became known. Lead Plaintiffs and the Class would not have purchased Sunnova securities at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by these Defendants' misleading statements.

225. Lead Plaintiffs will fairly and adequately protect Class members' interests and have retained competent counsel experienced in class actions and securities litigation.

226. As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages attributable to the material misstatements and omissions alleged herein in connection with their purchases of Sunnova securities during the Class Period.

**COUNT II**

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

227. Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

228. This Count is asserted on behalf of all members of the Class against Defendants Berger and Lane, for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

229. During their tenures as officers and/or directors of Sunnova, each of these Defendants was a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act. By reason of their positions of control and authority as officers and/or directors of Sunnova, these Defendants had the power and authority to direct the management and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein. These Defendants were able to and did control, directly and indirectly, the content of the public statements made by Sunnova during the Class Period, including its materially misleading financial statements, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

230. In their capacities as senior corporate officers of the Company, Defendants Berger and Lane had direct involvement in the day-to-day operations of the Company. Defendants Berger and Lane signed certain of the Company's SEC filings during the Class Period and were directly involved in providing false information and certifying and approving the false statements

disseminated by Sunnova during the Class Period. As a result of the foregoing, Defendants Berger and Lane, as a group and individually, were controlling persons of Sunnova within the meaning of Section 20(a) of the Exchange Act.

231. As set forth above, Sunnova violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint.

232. By virtue of their positions as controlling persons of Sunnova and as a result of their own aforementioned conduct, Defendants Berger and Lane are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder, to Lead Plaintiffs and the other members of the Class who purchased or otherwise acquired Sunnova securities. As detailed above, during the respective times these Defendants served as officers and/or directors of Sunnova, each of these Defendants was culpable for the material misstatements and omissions made by Sunnova.

233. As a direct and proximate result of these Defendants' conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchase or acquisition of Sunnova securities.

234. During the Class Period, the Individual Defendants participated in the operation and management of Sunnova, and conducted and participated, directly and indirectly, in the conduct of Sunnova's business affairs. Because of their senior positions, they knew the adverse non-public information about Sunnova's operations.

235. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Sunnova's

financial condition and results of operations, and to correct promptly any public statements issued by Sunnova which had become materially false or misleading.

236. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Sunnova disseminated in the marketplace during the Class Period concerning Sunnova's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Sunnova to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Sunnova within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Sunnova securities.

237. Each of the Individual Defendants, therefore, acted as a controlling person of Sunnova. By reason of their senior management positions and/or being directors of Sunnova, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Sunnova to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Sunnova and possessed the power to control the specific activities which comprise the primary violations about which Lead Plaintiffs and the other members of the Class complain.

238. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Sunnova.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief judgment against Defendants as follows:

A. Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as class representatives, and designating Lead Counsel as Class Counsel;

B. Awarding Plaintiffs and the Class all damages and other remedies available under the Exchange Act in an amount to be determined at trial, together with pre-judgment and post-judgment interest thereon;

C. Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees, accountants' fees, and expert fees; and

D. Awarding such equitable, injunctive, or other further relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiffs hereby demand a trial by jury.

DATED: June 28, 2024

Respectfully submitted,

By: *<u>/s/ Lucas E. Gilmore</u>*

Lucas E. Gilmore (CA Bar No. 250893)
(admitted pro hac vice)
Reed R. Kathrein (CA Bar No. 139304)
(pro hac vice forthcoming)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
reed@hbsslaw.com
lucasg@hbsslaw.com

*Counsel for Co-Lead Plaintiff Christopher Scott Berger*

Martin Woodward (TX Bar No. 00797693)
**KITNER WOODWARD PLLC**
13101 Preston Road, Suite 110
Dallas, TX 75240
Telephone: (214) 443-4300
Facsimile: (214) 443-4304
martin@kitnerwoodward.com

*Liaison Counsel for Co-Lead Plaintiff Christopher Scott Berger*

William B. Federman, TBA #00794935
**FEDERMAN & SHERWOOD**
212 W. Spring Valley Road
Richardson, TX 75081
Telephone: (405) 235-1560
Facsimile: (405) 239-2112
Email: wbf@federmanlaw.com.

*Liaison Counsel for Co-Lead Plaintiff Landon Lueshen*

Ex Kano S. Sams II (*pro hac vice*)
Raymond D. Sulentic (*pro hac vice*)
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: esams@glancylaw.com
Email: rsulentic@glanylaw.com

*Counsel for Co-Lead Plaintiff Landon Lueshen*